## STATE OF CONNECTICUT *v.* LEON E. BELL
## (AC 26501)

Gruendel, Harper and Mihalakos, Js.

Argued September 26, 2005—officially released February 14, 2006

*Kirstin B. Coffin,* special public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Thomas R. Garcia*, assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Leon E. Bell, appeals from the judgments of conviction, rendered after a jury trial, of two counts each of robbery in the first degree in violation of General Statutes § 53a-134 (a), burglary in the third degree in violation of General Statutes § 53a-103 (a), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (b) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (2). The charges arose out of two incidents occurring at Friendly's restaurants, the first in Manchester on April 12, 2001, and the second in Glastonbury on April 14, 2001. The defendant claims that the trial court improperly (1) granted the state's motion to consolidate the two informations, (2) denied his motion to suppress identification evidence, (3) denied his motion to suppress his statement to the police and (4) denied his motion for a judgment of acquittal on the basis of insufficient evidence. We affirm judgments of the trial court.

The jury reasonably could have found the following facts. During the early hours of April 12, 2001, at a Friendly's restaurant in Manchester, manager Cheryl Royer, alone in the restaurant, was locking up for the night. While exiting the front doors to go home, Royer was confronted by the defendant. Royer recognized the defendant, but could not at that time recall the circumstances as to how she had met him. The defendant told her that he had a gun and ordered her to take him to the safe. After she unlocked the safe, Royer started screaming and pleading for the defendant not to hurt her. The defendant told Royer to go into the walk-in refrigerator for fifteen minutes. Royer stayed

in the refrigerator for only a few minutes, ran out and called 911. When the police arrived at the restaurant, Royer told the police that she recognized the perpetrator and described him as a tall, slender black male wearing a tan jacket and a black knit hat.

That evening, Royer remembered that she had met the defendant a few years prior when they worked the same shift at another Friendly's restaurant. Royer called the Manchester police department and reported the defendant's name. The next day, Detective Michael Morrissey of the Manchester police department met with Royer at the restaurant and showed her a photographic array. Royer immediately identified the defendant as the perpetrator of the Manchester robbery.

On April 14, 2001, Tricia Smith, the assistant manager of a Friendly's restaurant in Glastonbury, arrived at the store alone at about 6 a.m. to open the restaurant. As she unlocked the front door, the defendant, unmasked, came up behind her and forced his way into the restaurant. He told her that he would not hurt her if she did what he told her to do. Smith was fixated on something the defendant was holding in his hand under his jacket that "looked like a gun." The defendant ordered her to take him to the safe. By the time Smith had reached the safe, the defendant had put a bandana over the lower portion of his face. After Smith opened the safe, the defendant told her to get into the walk-in refrigerator. Smith waited a few minutes in the refrigerator until she thought the defendant had left the restaurant. She then ran to a nearby gasoline station for help. Smith, in speaking to the police, described the defendant as a tall, skinny black male and stated that she would recognize him if she saw him again. Detective William Sanderson from the Glastonbury police department met with Smith a few hours after the robbery and presented her with the same photographic array that was shown to

Royer. Smith identified the defendant as the perpetrator of the Glastonbury robbery.

The defendant was arrested at approximately 4 p.m. on April 14, 2001, pursuant to a warrant in connection with the Manchester robbery. He was taken to the Manchester police department where he was also arrested and charged with the Glastonbury robbery. That evening, the defendant confessed to both the Manchester and Glastonbury robberies. The defendant was charged in separate informations that were consolidated for trial. Following a jury trial, the defendant was convicted of two counts each of robbery in the first degree, burglary in the third degree, kidnapping in the first degree and larceny in the third degree. This appeal followed.

I

The defendant's first claim is that the court abused its discretion in granting the state's motion to consolidate the two cases for trial. The defendant contends that he suffered substantial prejudice because the consolidation of the two cases made the jury more likely to convict him on each case. We disagree.

The trial court is empowered to consolidate or to sever cases. General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19.[1] "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of

[1] "Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together.""

showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). "[B]ecause joinder foster[s] economy and expedition of judicial administration . . . we consistently have recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to joinder or severance of two or more charges." (Internal quotation marks omitted.) *State* v. *Cook*, 70 Conn. App. 114, 120, 796 A.2d 1269 (2002), cert. denied, 263 Conn. 922, 822 A.2d 243 (2003).

A court's discretion regarding joinder, however, is not unfettered. "The determination to try a defendant jointly on charges arising from separate cases may only be reached if consistent with the defendant's right to a fair trial." *State* v. *Rivera*, 260 Conn. 486, 490, 798 A.2d 958 (2002). In *State* v. *Boscarino*, 204 Conn. 714, 722–23, 529 A.2d 1260 (1987), our Supreme Court identified certain factors a trial court should consider in determining whether a severance is necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. "These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 658, 583 A.2d 915 (1990); *State* v. *Boscarino*, supra, 722–23.

Applying the *Boscarino* factors to the present case, we conclude that the defendant has not proved substantial prejudice resulting from the consolidation of the two informations.[2] First, the two cases involved discrete, factually distinguishable scenarios. Although both crimes were perpetrated at Friendly's restaurants where a lone employee was ordered into a walk-in refrigerator, the crimes were not so similar that there was danger that the jury would use the evidence of one crime to find the defendant guilty of the other. See *State* v. *Horne*, 215 Conn. 538, 546, 577 A.2d 694 (1990). The crimes took place on different days, at different times of day, in different towns and with different victims, both of whom testified at trial; there was thus little danger that the jury would be unable to consider each information separately. We find this case analogous to *State* v. *Fauci*, 87 Conn. App. 150, 160, 865 A.2d 1191, cert. granted on other grounds, 273 Conn. 921, 871 A.2d 1029 (2005), in which this court found no abuse of discretion in the joinder of three informations arising out of the robberies of three different fast food restaurants, including two McDonald's, where, in each incident, two men attempted to break into the restaurants by throwing a rock through the glass doors.

Regarding the second *Boscarino* factor, we disagree with the defendant that the crimes were so shocking

[2] The crux of the defendant's argument is that because the state's case in the Manchester incident was much stronger than its case in the Glastonbury incident, the joinder of the two informations for trial prejudiced him because it made the Glastonbury case stronger than it would have been on its own. The defendant underestimates the strength of the state's case in the Glastonbury robbery. See *State* v. *Smith*, 10 Conn. App. 624, 628, 525 A.2d 116, cert. denied, 204 Conn. 809, 528 A.2d 1156 (1987). Furthermore, although our case law recognizes the "omnipresent risk" when consolidating cases that the jury will accumulate the evidence, we have consistently held that the *Boscarino* factors and the court's instructions to the jury serve as a sufficient check against that risk. See, e.g., *State* v. *Howard*, 88 Conn. App. 404, 420–21, 870 A.2d 8, cert. denied, 275 Conn. 917, 883 A.2d 1250 (2005).

as to have inflamed the passions of the jury.[3] The defendant frightened each victim by implying that he was armed and by ordering them into a walk-in refrigerator. This court has held that a robbery in which the defendant threatened the use of force by implying that he had a firearm "was not particularly brutal or shocking." *State* v. *Smith*, 88 Conn. App. 275, 279, 869 A.2d 258, cert. denied, 273 Conn. 940, 875 A.2d 45 (2005). We note that even a robbery carried out with the use of firearms is not necessarily brutal or shocking if no victim has been injured physically. See *State* v. *Fauci*, supra, 87 Conn. App. 159. Whether a crime is shocking is determined not by the reaction of the victim, but by the conduct of the defendant. See *State* v. *Boscarino*, supra, 204 Conn. 723. Although both victims, especially Royer, were understandably upset as a result of the robberies, the crimes perpetrated against them were not of the type to be so shocking as to inflame the passions of the jury.[4]

In support of his claim that he was prejudiced by the consolidation, the defendant argues that the crimes charged were not signature crimes and that, had the cases been tried separately, evidence of the Manchester robbery would not have been admissible in the trial of the Glastonbury robbery. We are not persuaded by the defendant's argument.

"Because of its prejudicial impact, evidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts. . . . An exception to the rule prohibiting the substantive admission of a defendant's prior criminal offenses in the trial of another case is when the collat-

[3] The defendant conceded at oral argument that the crimes were not of a violent nature, but argued that they nonetheless were of a shocking nature.

[4] We note that the defendant does not claim with respect to the third *Boscarino* factor that the trial was overly long or complex. In fact, the defendant's entire trial lasted only four days with only two days of testimony.

eral crime tends directly to prove the commission of the principal crime, or the existence of any element of the principal crime. . . . Consistent with this rule, the state may introduce evidence of other crimes to establish a defendant's intent, identity, malice, motive or system of criminal activity. . . .

"Where evidence of one incident can be admitted at the trial of [another incident], separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Internal quotation marks omitted.) *State* v. *Fauci,* supra, 87 Conn. App. 156.

We agree with the court's ruling that the crimes in the two cases were sufficiently unique and that even if the two robberies did not constitute signature crimes, evidence of the Manchester robbery likely would have been admissible at the trial of the Glastonbury robbery because the defendant's arrest in connection with the Glastonbury robbery occurred as a direct result of the investigation of the Manchester robbery. See *State* v. *Smith,* supra, 10 Conn. App. 628. Our conclusion that evidence of the crimes would have been mutually admissible in separate trials undermines the defendant's claim of prejudice. We note, however, that even if we were to conclude that the similarities of the crimes were not sufficient to allow for cross admissibility, the court did not abuse its discretion in granting the state's motion for joinder of the charges. See *State* v. *Fauci,* supra, 87 Conn. App. 160. The court, after consolidating the informations, instructed the jury not to use the evidence from one case in its consideration of the other. "Barring contrary evidence, we must presume that juries follow the instructions given them by the trial judge." (Internal quotation marks omitted.) *State* v. *Lewis,* 60 Conn. App. 219, 232, 759 A.2d 518, cert. denied, 255 Conn. 906, 762 A.2d 911 (2000).

Although we conclude that the defendant did not suffer substantial prejudice as a result of the consolidation, we nonetheless address the adequacy of the jury instructions. "[A]lthough a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evidence . . . where the likelihood of prejudice is not overwhelming, such curative instructions may tip the balance in favor of a finding that the defendant's right to a fair trial has been preserved." (Internal quotation marks omitted.) Id., 231–32. In the present case, the court repeatedly emphasized to the jury that the two informations were to be considered separately without accumulating the evidence. Those warnings were issued by the court from the beginning of the trial through the conclusion of the jury instructions. We hold that those instructions were sufficient to overcome any prejudice that may have occurred. For the foregoing reasons, we conclude that the court did not abuse its discretion in granting the state's motion to consolidate.

II

The defendant next claims that the court improperly denied his motion to suppress pretrial identification evidence in the form of a photographic array that was shown to both victims. The defendant claims that the photographic array was unnecessarily suggestive for the following reasons: (1) the police told both victims that the suspect was present in the array; (2) the defendant's photograph was the only one that indicated a horizontal black line across the defendant's chest; (3) the photograph depicting the defendant was the only photograph in the array with a gray colored background; and (4) the defendant's photograph was placed in the front center of the array. The defendant further claims that the photographic array was unreliable. We disagree.

To determine whether a pretrial identification through a photographic array violated a defendant's right to due process, "the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) State v. Blackwell, 86 Conn. App. 409, 414, 861 A.2d 548 (2004), cert. denied, 272 Conn. 922, 867 A.2d 838 (2005). "Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) State v. Ledbetter, 275 Conn. 534, 548, 881 A.2d 290 (2005).

The court found the following facts relevant to the defendant's motion to suppress the photographic array. Royer was shown the array on April 12, 2001, less than twenty-four hours after the Manchester robbery and after she had already told the police the defendant's name. Smith was shown the same array two days later, on April 14, 2001, within a few hours of the Glastonbury robbery. Prior to Smith's viewing of the array, the police told her that they believed that the suspect in that case was the same person involved in the Manchester rob-

bery. After viewing the array, each witness identified the defendant as the perpetrator of the robbery.

The court made the following observations as to the appearance of the array. The court determined that the array consisted of eight color photographs of black males similar in appearance to the defendant. The photographs were arranged in two rows of four, with the defendant's photograph positioned in spot number three, in the upper left center of the array. The photograph depicting the defendant had a black, "L shaped" line across part of the defendant's upper chest. Each of the eight photographs had a background of a slightly different color, all varying shades of blue and gray. On the basis of those findings, the court determined that nothing about the photographic array made it unduly suggestive. We agree.

The evidence does not show that any comment made by the police suggestively drew the attention of either witness to the defendant's photograph. Although both witnesses were aware that the suspect's photograph was present in the array, that alone does not make the array unnecessarily suggestive. *State* v. *Reid*, 254 Conn. 540, 556–57, 757 A.2d 482 (2000).[5] "Even if a court finds that the police expressly informed witnesses that the defendant would be in the array, our courts have found the identification procedure unnecessarily suggestive

[5] In *State* v. *Ledbetter*, supra, 275 Conn. 578–79, the Supreme Court, while declining to overrule that principle, exercised its supervisory powers to direct that in the future, trial courts incorporate a jury instruction warning of the risk of misidentification when, as here, the administrator of the identification procedure failed to instruct the witnesses that the perpetrator may or may not be present in the procedure. The Supreme Court's direction that trial courts incorporate such a cautionary instruction "in the future"; id., 579; indicates that the court intended its decision to apply prospectively only. See *State* v. *Young*, 57 Conn. App. 566, 572, 750 A.2d 482 (2000), rev'd in part on other grounds, 258 Conn. 79, 779 A.2d 112 (2001). As the trial in this case concluded well before the issuance of the decision in *Ledbetter*, the court was not bound to give the cautionary instruction here.

only when other factors exist that otherwise emphasize the defendant's photograph." *State* v. *Owens*, 38 Conn. App. 801, 811, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995).

No other factors existed in this case to make the array unnecessarily suggestive. Our case law is clear that a photographic array is not unnecessarily suggestive just because a picture varies slightly from others in the array. "Any array composed of different individuals must necessarily contain certain differences. . . . Differences in the size and color composition of photographs in and of themselves do not render an array . . . unnecessarily suggestive." (Citations omitted; internal quotation marks omitted.) *State* v. *Boscarino*, supra, 204 Conn. 726–27. The court determined that the dark gray color of the defendant's photograph did not draw any particular attention to it. The court also found that the black line across the defendant's photograph did not draw suggestive attention to the photograph and that there was no way to tell from viewing the photograph what the black line was.

We defer to the court on that finding of fact. We point out nonetheless that this court held in *State* v. *Soriano*, 2 Conn. App. 127, 129–31, 476 A.2d 633 (1984), that a photographic array was not unduly suggestive even though the defendant's photograph depicted a placard hanging from the defendant's neck displaying numbers and the words "New York City Police Dept." The witnesses in *Soriano* viewed the defendant's photograph independently of one another, and testified that they had no doubt about their identification of the defendant from his photograph in the array and did not notice the placard in the photograph. Id., 131. We conclude, therefore, that in this case, in which the victims also viewed the defendant's photograph independently of each other, that there was no evidence that the victims relied on the presence of the black line when identifying

the defendant's photograph, and we agree with the court that the procedures used in the identification process were not unnecessarily suggestive.

Even if we were to assume arguendo that the identification procedure was suggestive, we hold that it was reliable under the totality of the circumstances. Reliability is "the linchpin in determining the admissibility of the identification testimony . . . . In evaluating the reliability of an identification procedure, the court considers various factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (Citation omitted; internal quotation marks omitted.) *State* v. *Elliston*, 86 Conn. App. 479, 484, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005).

In this case, although each victim had only seconds to view the perpetrator of the robbery, each testified that she clearly saw his face and would be able to recognize him again. Each victim viewed the photographic array and made an identification within hours of the crime when the perpetrator's face was fresh in her mind. Although Royer's initial description of the perpetrator to the police was more detailed than Smith's, both descriptions were consistent with the defendant's physical appearance. Both victims identified the defendant with certainty, both in the photographic array and in court. On the basis of the totality of the circumstances, the pretrial identification of the defendant by both Royer and Smith was reliable. Because the defendant failed to satisfy either prong of the test for establishing that a pretrial identification procedure violated his due process rights, the court

properly denied his motion to suppress the photographic array.

## III

The defendant's third claim is that the court improperly denied his motion to suppress his statement to the police. His argument is twofold. He first contends that the court improperly concluded that he voluntarily, knowingly and intelligently waived his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He also contends that the court improperly determined that his confession was voluntary.

The following factual findings were made by the court and are relevant to the disposition of the defendant's claim. The defendant was arrested at 4 p.m. on April 14, 2001, on the Manchester warrant and was fully advised of his *Miranda* rights at that time. He was taken into custody at the Manchester police department where he denied any involvement in the Manchester robbery. Later that same day, the Glastonbury police obtained an arrest warrant for the defendant on the basis of Smith's identification. Detective Sanderson of the Glastonbury police department went to the Manchester police department, arrested the defendant, read him his rights from a notice of rights form, and had him read and sign the form. The defendant refused to speak about the Glastonbury robbery, whereupon Sanderson left the police department.

At approximately 10 p.m., six hours after the defendant's initial arrest, Detective Morrissey of the Manchester police department fingerprinted and processed the defendant. Morrissey again fully advised the defendant of his *Miranda* rights through a notice of rights form. The defendant read and signed the form, and then indicated that he was willing to talk about the incidents. Morrissey interviewed the defendant for approximately

one and one-half hours, during which time the defendant confessed to both robberies. At no time during the interview did the defendant indicate any desire to end the session. Morrissey transcribed his notes from the interview into a written statement and gave it to the defendant to review. After the statement was finalized, Morrissey again advised the defendant of his *Miranda* rights. The defendant acknowledged that he understood his rights and signed the advisement of rights at the top of his statement.

The court, after reciting all of those facts, found that there was no evidence to lead the court to believe that on the totality of the circumstances, either the waiver of rights was not voluntary or the statement was not voluntarily given. We agree.

## A

The defendant's first argument is that he did not waive his *Miranda* rights voluntarily, knowingly and intelligently. We disagree.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 72–73, 782 A.2d 149 (2001), cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

We agree with the court that the totality of the circumstances surrounding the defendant's waiver of his *Miranda* rights indicates that he both understood his rights and waived them. The court found that nothing about the defendant's age, intelligence level or mental state suggested that he was unable, voluntarily, knowingly and intelligently, to waive his rights. That the defendant gave express written waiver of his rights on at least three occasions is particularly strong proof that his waiver was voluntary, knowing and intelligent. See id., 73. We conclude that the waiver was valid.

B

The defendant's second argument is that his confession was not voluntary. We disagree.

"[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by

a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . . The ultimate question is whether the confession is the product of an essentially free and unconstrained choice. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . .

"The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . We, however, make a scrupulous examination and conduct a plenary review of the record in order to make an independent determination of voluntariness. . . . Under the federal constitution . . . coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reyes*, 81 Conn. App. 612, 616, 841 A.2d 237 (2004).

On the basis of our scrupulous examination of the record, we conclude that the state has proved by a preponderance of the evidence that the defendant voluntarily confessed to the Glastonbury and Manchester robberies. The defendant's refusal to discuss his involvement in the robberies with Morrissey or Sanderson at the time he was arrested is not sufficient proof that the defendant's later confession was involuntary. The defendant was detained for only six hours before he agreed to discuss the robberies, and the interview that followed lasted only one and one-half hours. The defendant was informed of his rights both before he was interviewed by Morrissey and before he signed the statement confessing to the robberies. There is no

evidence that during his time at the police station, the defendant was deprived of food or sleep, or was subjected to any other form of coercive police conduct. As a result, we hold that the court properly denied the defendant's motion to suppress his statement to the police.

## IV

The defendant's final claim is that the court improperly denied his motion for a judgment of acquittal as to one count of robbery in the first degree on the ground of insufficient evidence because with respect to the Glastonbury incident, he did not display or represent by his words or conduct that he had a firearm. We disagree.[6]

Our Supreme Court in *State* v. *Smith*, 273 Conn. 204, 209–10, 869 A.2d 171 (2005), reiterated the two part test to be applied when reviewing a sufficiency of the evidence claim: "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences

---

[6] Although the defendant failed to raise that claim in his motion for a judgment of acquittal, we will review the merits of the claim. "We have stated . . . that [a]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Brown*, 90 Conn. App. 835, 838, 879 A.2d 466, cert. denied, 276 Conn. 901, 884 A.2d 1026 (2005).

from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id.

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a

weapon from which a shot could be discharged. . . ." Our case law consistently has held that "[u]nder [§ 53a-134 (a) (4)] the state retains the burden of proving that the defendant forcibly took property by displaying or threatening to use what he represented was a firearm." *State* v. *Hawthorne*, 175 Conn. 569, 574, 402 A.2d 759 (1978). "[T]he essential element of subsection (a) (4) . . . is the *representation* by a defendant that he has a firearm. Under this portion of § 53a-134, a defendant need not have an operable firearm; in fact, he need not even have a gun. He need only *represent* by his words or conduct that he is so armed." (Emphasis added.) Id., 573.

The defendant argues that because no gun was displayed and he did not tell Smith that he had a gun, the evidence was insufficient to meet the requirement of § 53a-134 (a) (4). We find that argument highly unpersuasive because nothing in § 53a-134 (a) (4) requires that the defendant state specifically that he is armed with a firearm as long as he somehow conveys that message through his words or conduct. See, e.g., *State* v. *St. Pierre*, 58 Conn. App. 284, 288–89, 752 A.2d 86, cert. denied, 254 Conn. 916, 759 A.2d 508 (2000); *State* v. *Arena*, 33 Conn. App. 468, 477, 636 A.2d 398 (1994) (defendant's statement to " 'hurry up' " and " 'nothing will happen,' " made while pointing object in hand covered by paper bag held to satisfy elements of § 53a-134 [a] [4]), aff'd, 235 Conn. 67, 663 A.2d 972 (1995).

At trial, the state presented evidence demonstrating that the defendant acted in such a way as to imply that he was carrying a firearm. Smith, the victim in the Glastonbury incident, testified that when the defendant approached her inside the restaurant, he told her that she "wouldn't get hurt" if she did what he told her to do. Smith testified further that the defendant was holding something under his jacket and was pointing it in her direction. She testified that the object "looked like a

gun." Considering the defendant's statement implying that Smith could get hurt, along with the way the defendant held the object under his jacket, in the light most favorable to sustaining the verdict, the jury reasonably could have inferred that the defendant had wanted Smith to think that he had a firearm. As a result, the court properly denied the defendant's motion for a judgment of acquittal on the charge of robbery in the first degree with respect to the Glastonbury incident.

The judgment is affirmed.

In this opinion the other judges concurred.