STATE OF CONNECTICUT *v.* SUSHIL GUPTA
(AC 27043)

Flynn, C. J., and Lavine and West, Js.

Argued September 4, 2007—officially released January 15, 2008

*Hugh F. Keefe*, with whom was *Nancy Fitzpatrick Myers*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey M. Haupt*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Sushil Gupta, a physician, appeals from the judgments of conviction, rendered after a jury trial, of two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (5). On appeal, the defendant claims that the trial court (1) abused its discretion in consolidating for trial charges arising from complaints of sexual assault made by three of his patients, (2) abused its discretion and deprived him of his constitutional right to present a complete defense when it excluded evidence in the form of instructional videotapes and learned medical treatises, and (3) improperly instructed the jury that it must consider the evidence in all three cases in determining whether he had engaged in a common scheme or method of sexually assaulting his patients. We agree with the defendant that the court abused its discretion in consolidating for trial the charges arising from the three alleged sexual assaults. We also agree with the defendant that the court abused its discretion when it excluded evidence in the form of instructional videotapes and learned medical treatises. We therefore reverse the trial court's judgments of conviction and order separate trials on the two informations on which the defendant was convicted. Because the first two issues are dispositive of this appeal, we find it unnecessary to discuss the third issue.

On the basis of complaints filed by M, J and D,[1] the defendant was charged in three, two count informations

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

with subjecting another person to sexual contact and accomplishing the sexual contact by means of false representation that the sexual contact was for a bona fide medical purpose by a health care professional in violation of § 53a-73a (a) (5)[2] and subjecting another person to sexual contact without such other person's consent in violation of § 53a-73a (a) (2).[3] Pursuant to the state's motion, the informations were consolidated for trial.

On July 27, 2005, the court granted the defendant's motion for judgments of acquittal on the second counts of the informations, subjecting another person to sexual contact without such other person's consent, with respect to J and D. The court denied the motion for judgments of acquittal as to the remaining counts of the three informations. On July 29, 2005, the jury found the defendant guilty of subjecting a person to sexual contact by means of a false representation that the sexual contact was for a bona fide medical purpose with respect to the informations concerning M and J[4]

---

[2] General Statutes § 53-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (5) such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional . . . ."

[3] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (2) such person subjects another person to sexual contact without such other person's consent . . . ."

[4] The fact that the jury did not return a verdict with respect to the second count in M's case does not affect this court's jurisdiction over the appeal. On July 27, 2005, the state conceded that the two counts in all three cases were pleaded in the alternative and that the jury could find the defendant guilty of only one of the two counts, not both. As a result, once the jury found the defendant guilty of count one in M's case, the state could not prevail on count two, and, therefore, it would have been unnecessary for the jury to consider that count. Moreover, even if count two in M's case had not been disposed of at the time the appeal was filed, the defendant's conviction under count one for sexual assault in the fourth degree in M's case would still be an appealable final judgment pursuant to Practice Book § 61-6 (a) (1), which provides in relevant part: "In cases where a final judgment has been rendered on fewer than all counts in the information or

and not guilty with respect to the information concerning D. On October 21, 2005, the court sentenced the defendant to consecutive terms of incarceration of 365 days, execution suspended after ninety days, and three years of probation on each count. The total effective sentence was 730 days, suspended after 180 days, with probation to follow. The defendant appeals from the two judgments of conviction.

The defendant is a physician with a specialization in pulmonology. At the times relevant to this appeal, the defendant was affiliated with a group practice, the Cardiothoracic and Vascular Group (medical group). The charges in the present case involved his interactions with three patients, and the facts regarding each patient will be discussed separately.

The jury reasonably could have found the following facts. On August 29, 2003, J was a college freshman. That morning, her father took her to her appointment with the defendant because she appeared to have a sinus infection and was suffering from allergies and asthma. Because J had had sinus infections in the past, she had seen the defendant once or twice previously. When the defendant entered the examining room, J revealed her symptoms to him. She also added that she was menstruating because some of the symptoms she was experiencing were common to both her sinus problems and menstruation. The defendant asked J if her breasts were tender while she was menstruating, and, as he asked her, he cupped his hands against his chest. The defendant then felt J's sinuses, looked in her ears, nose and throat and felt the glands in her neck. J then removed her sweatshirt, and the defendant lifted the back of her tank top and placed a stethoscope on her back to listen to her lungs.

complaint, the defendant may appeal from that judgment at the time it is rendered."

When the defendant examined J's chest, he partially rolled up the front of J's tank top, exposing the lower half of her breasts. Surprised by this, J moved back and asked the defendant if he wanted her to roll up her tank top. The defendant nodded yes, and J rolled up the rest of her tank top. At this point, J was leaning back with her arms behind her on the examination table. First, the defendant touched J's left breast with his two fingers. Then the defendant placed both of his palms on her breasts simultaneously, and he began kneading or massaging her breasts, running his thumbs over the top of her nipples. While massaging J's breasts, the defendant made a grumbling or a low moaning sound. The defendant had not performed this type of breast examination during J's previous visits for sinus infections. After checking her abdomen, the defendant completed the examination and prescribed medications for her sinus infection. The defendant also recommended a follow-up appointment, which J made that day but cancelled shortly thereafter.

After the examination, J did not tell her father about what had happened during her examination because she was not comfortable talking to him about it. J went home, however, and discussed the examination with her mother. J told her mother that she had a suspicion that she had been sexually assaulted. Although J did not report the incident immediately, she eventually reported it to the police department after seeing an article in the newspaper about another woman who had come forward after allegedly having been sexually assaulted by the defendant.

On November 7, 2003, D was twenty-two years old. On that day, D saw the defendant because her primary care physician had referred her to him after an X ray had revealed spots on her lungs. When D entered the examination room, a nurse asked her to remove her shirt but to keep her bra on and gave her a gown to

put on. When the defendant came in, he felt D's glands and listened to her lungs with a stethoscope. He then asked her to unhook her bra and to lie down on the examination table. The defendant first used two fingers to feel D's breasts, but then he felt both breasts, one at a time, with his full hand. He did this twice to each breast. After completing the examination, the defendant told D that he was very worried about her condition and that she should make another appointment for five days later.

On November 12, 2003, D returned for her second appointment. After D took a pulmonary functions test, the defendant examined her. The defendant asked D to unhook her bra, and then she lay down on the table. He then repeated the same procedure he had done during her first examination. He first used two fingers to feel around her breasts and then felt first one breast and then the other breast with his full hand. He did this twice with each breast. At the end of the examination, the defendant made a comment to D about how she was physically fit. After that appointment, D scheduled one more appointment for three weeks later. D was uncomfortable at the previous visit, but she returned regardless in an attempt to cure her illness. At this third appointment, the defendant performed the same examination he had performed during the two previous appointments. The defendant recommended that D schedule another appointment with him in March, 2004. Although she scheduled the appointment, she did not keep it. D did not report the incidents to the police until she heard about the defendant's having been charged with the sexual assaults of two other women.

In March, 2004, M was employed as a medical assistant by the medical group. She had been employed by the medical group for four years. M mainly worked in one office, but on March 26, 2004, M was filling in for the defendant's medical assistant in another office.

Prior to this date, M had approached the defendant about her having an examination with him. She was concerned because her father had told her that her mother and her grandfather had had tuberculosis and that she had tested positive for it as a baby. As a result, the defendant suggested that she have a chest X ray, and she complied with the recommendation. The defendant subsequently looked at the X ray, which he determined was normal. Nevertheless, he told her that she should still have an examination. The defendant then approached her three times about her having an examination with him.

On March 26, 2004, the defendant examined M. He directed her to an examination room where she sat down on the examination table. The defendant closed the door behind them and then closed the window blinds. At that point, the defendant approached M, grabbed her face, kissed both sides of her cheeks and thanked her for coming in to help him that day. He then examined her by checking the glands in her neck and looking into her mouth. Next, he used a stethoscope on her back to listen to her breathing. As he was doing that, he asked her if he could remove her laboratory coat and then went under her shirt to listen to her breathing. He then asked if he could undo her bra and proceeded to do so. He listened to her chest and then went under her shirt in the front and listened to her chest again. When he was finished, M pulled her shirt down. The defendant then asked M to lie down on the examination table. She lay down on the table, and he pulled her top up quickly, taking the bra with it and fully exposing her breasts. The defendant told M that he was going to check for lumps. He began to feel her breasts with his fingertips, but then he firmly grabbed both of her breasts with his hands and started to massage them. As he massaged her breasts, the defendant remarked to M that her breasts were soft and beautiful.

Next, the defendant tapped M's stomach and remarked that her stomach was flat. With one hand, the defendant pulled back the bottom of her pants, taking the underwear with it and exposing the top of her "private area." As he was tapping her pelvic bone, he commented that she was shaved and told her that she was "so hot." At that point, M asked the defendant if they were finished, and the defendant said it would only be a few more minutes.

The defendant then again firmly massaged M's breasts with both of his hands. The defendant asked if he could kiss her breasts. Although M replied "no," the defendant proceeded to put his mouth on each breast and to suck on them briefly. He also pinched her nipples. At that point, M jumped up from the table, pulled down her shirt and said, "No, we are done. That is enough." The defendant then came up from behind M, put his hands underneath her shirt and grabbed her breasts, asking to feel her while she was sitting up. In response, M firmly took the defendant's hands, pulled them down and stated, "No, we are done." The defendant then told M she was fine and did not prescribe any medication for her.

M walked out of the examination room, and the defendant followed her, asking if they could have lunch sometime. M responded "sure," and the defendant asked if she would have lunch at the office that day. She tried to tell him that she had to get back to the other office, but he was persistent in asking her until she agreed to stay. M stayed for a few minutes before deciding to leave. Before M left, the defendant grabbed her face and kissed both sides of her cheeks. He then attempted to kiss her on the lips, but she turned her head, so he bit at her cheek in a sexual manner.

M reported the incident to her fiance later that evening. They decided, first, to call a rape victims' hotline.

Thereafter, M went to the police and gave a statement accusing the defendant of sexually assaulting her. As a result of the assault, M did not return to work at the medical group. Additional facts will be set forth as necessary.

I

The defendant claims that the court abused its discretion in consolidating for trial the cases of the three alleged sexual assault victims. Specifically, the defendant claims that one alleged victim's claims were substantially more egregious than the other two, and, as a result, the consolidation of the cases unfairly permitted the jury to aggregate the evidence against the defendant in all three cases.

As a preliminary matter, we set forth the legal principles that guide our resolution of the defendant's claim. On March 18, 2005, the defendant filed a motion for severance of offenses for purpose of trial. On May 17, 2005, the state responded with a motion to consolidate. Oral argument was heard on the two motions on June 3, 2005, and, at that time, the court denied the defendant's motion for severance and granted the motion to consolidate. General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19. "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . . [B]ecause joinder foster[s] economy and expedition of judicial

administration . . . we consistently have recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to joinder or severance of two or more charges. . . .

"A court's discretion regarding joinder, however, is not unfettered. The determination to try a defendant jointly on charges arising from separate cases may only be reached if consistent with the defendant's right to a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, 93 Conn. App. 650, 654–55, 891 A.2d 9, cert. denied, 277 Conn. 933, 896 A.2d 101 (2006). In *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), our Supreme Court identified several factors that a trial court should consider in making its determination of whether severance is required. "These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 375, 852 A.2d 676 (2004).

The defendant's main argument is that M's claim was far more egregious than those of J and D, and, as a result, grave prejudice resulted to him. The defendant compared the facts of his case to those of *Ellis*. In *Ellis*, the defendant was convicted of sixteen counts of sexual misconduct involving three victims. One victim claimed that the defendant had grabbed her breast through her clothing. Another victim claimed that the defendant had grabbed her breast through her clothing on two different occasions. Id., 345–46. The third victim

claimed that the defendant had done several things to her, including, having sexual conversations with her, engaging her in "phone sex"; id., 359; while telling her he was masturbating, grabbing her breast through her clothing on multiple occasions, touching her between her legs on multiple occasions, exposing himself to her, attempting to make her perform oral sex on him and forcibly kissing her. Id., 346–48. In *Ellis*, our Supreme Court decided that the trial court had abused is discretion in consolidating the cases of the three victims "because the defendant's abuse of [the third victim] was substantially more egregious than his abuse of the other two girls." Id., 378. Furthermore, the court found "that the [trial] court's instructions to the jury were insufficient to cure the substantial prejudice to the defendant that resulted from the improper joinder." Id., 369.

We find the present case to be analogous to *Ellis*. M's claims against the defendant were far more egregious than the claims made by J and D. For instance, J and D claimed that the defendant had touched their breasts improperly during a purportedly legitimate examination. In contrast, M claimed that the defendant had not only touched her breasts improperly during a purportedly legitimate examination, but also that he had made several inappropriate comments to her while examining her, had kissed and sucked her breasts without her permission, had pinched her nipples without her permission and had grabbed her breasts without her consent. During trial, the state presented M's case first to the jury and followed with the cases containing the less egregious claims. Therefore, as the court noted in *Ellis*, "joinder prevented the jury from an impartial consideration of the charges in the latter two cases." Id., 378. Furthermore, just as in *Ellis*, the joinder permitted the jury to view the testimony of M as bearing on the culpability of the defendant with respect to both J

and D, despite the fact that the court repeatedly told the jury to consider these cases separately.

Throughout the trial and numerous times in the charge to the jury, the court told the jury to consider the three cases separately. Nevertheless, there was some prejudice to the defendant that even proper instructions from the court could not cure. Our Supreme Court has recognized that "an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 763, 670 A.2d 276 (1996)

In the present case, some of these risks are present. For instance, there were several charges made against the defendant, and this litany of charges may have convinced the jury that he had to have committed at least one of the crimes with which he was charged. Second, the jury may have cumulated the evidence from all of the cases to find the defendant guilty in J's and M's cases. The insufficiency of the court's repeated admonitions against cumulating the cases became obvious during the foreperson's reading of the verdict. When asked if the jury found the defendant guilty in the first case,

the foreperson replied, "guilty." Next, the court clerk asked whether the jury had found the defendant guilty in the second case, and the foreperson replied, "I am not sure I understand that. Are we separating the three girls?"

The state, however, argued that the jury's finding the defendant not guilty in D's case demonstrated that it was able to consider each of the cases separately. The state made this same argument in *Boscarino*, in which our Supreme Court was unpersuaded and stated, "[w]e can only speculate as to why the jury rendered varying conclusions as to the defendant's guilt in the four cases. It is beyond our power to probe the minds of the jurors in order to determine what considerations influenced their divergent verdicts." *State* v. *Boscarino*, supra, 204 Conn. 724.

Because the defendant's behavior with respect to M was far more egregious than his behavior with respect to J and D, we conclude that substantial prejudice resulted to the defendant to the point where he did not receive a fair trial. Accordingly, we conclude that the three cases were consolidated improperly for trial.

II

The defendant also claims that the court abused its discretion and deprived him of his constitutional right to present a complete defense when it excluded evidence in the form of instructional videotapes and learned medical treatises. The court held that the evidence was irrelevant, cumulative and had a tendency to confuse the jury.

We begin our analysis by setting forth the applicable legal principles. "It is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb

the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260, 796 A.2d 1176 (2002).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; internal quotation marks omitted.) Id., 261–62.

During direct examination of his expert witness, Francoise Joelle Roux, a pulmonologist, the defendant attempted to introduce several excerpts from medical treatises.[5] The state objected to the introduction of this evidence. The state argued that the various medical texts were cumulative, and, as such, it was well within the discretion of the court to exclude them. After hearing arguments from both sides, the court sustained the state's objection on several grounds, stating: "The court believes that the issues that the jury must decide on this case have to do with a sexual assault and not the details of the examinations that are not relevant in some instances to the case. The court also believes it is cumulative of the evidence that's coming in through this witness and Dr. [Thomas J.] Godar[6] . . . . I don't want to confuse the jury in this case, a criminal matter, so, for those reasons, I will sustain the objection that they not be admitted as full exhibits." On appeal, the defendant argues in his brief that the excerpts used words,

[5] These documents were marked M through W for identification only in the court's file.

[6] Godar, a pulmonologist, served as the state's expert witness.

pictures and diagrams to illustrate the proper method for conducting a pulmonological examination. He also asserts that the documents were offered for the purpose of demonstrating that the breast examination described by the three complainants was consistent with accepted medical practice.

We conclude that the excerpts from the medical treatises were relevant to the issue being tried. Connecticut Code of Evidence § 4-1 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." The main issue at trial was whether the defendant's purported examination of the complainants was a legitimate medical procedure. It is only through describing and demonstrating to the jury how a pulmonary examination is to be done that the defendant would be able to prove that his examination of the complainants was consistent with recognized and accepted medical practices. The excerpts from medical treatises that the defendant attempted to introduce accomplished this task by using words, pictures and diagrams to convey the proper method for performing a pulmonary examination. Therefore, because the excerpts would have aided the trier of fact in determining a material issue in the proceeding, they were relevant.

Nevertheless, we are mindful that relevant evidence can be excluded. Connecticut Code of Evidence § 4-3 provides that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." In the present case, the court found that the excerpts were cumulative and had the potential to confuse the jury. We disagree.

In *Cross* v. *Huttenlocher*, 185 Conn. 390, 440 A.2d 952 (1981), our Supreme Court stated that "[u]nder Connecticut law, if a medical treatise is recognized as authoritative by an expert witness and if it influenced or tended to confirm his opinion, then relevant portions thereof may be admitted into evidence in the exercise of the trial court's discretion." Id., 395. In the present case, the defendant's expert witness, Roux, testified that the medical treatises corroborated her opinion. Therefore, the medical treatises were not needlessly cumulative.

Additionally, the court ruled that the excerpts had the potential to confuse the jury. We disagree. Although the excerpts do contain various medical terms, there is enough plain language that an average person with no medical background would be capable of understanding the words, pictures and diagrams. Furthermore, the attorneys were able to examine the expert witnesses while referring to the excerpts. Therefore, any confusion that might have arisen from the jurors' looking at the excerpts during deliberation could have been clarified during direct and cross-examination of the expert witnesses. Because the evidence was relevant, noncumulative and would not tend to confuse the jury, we hold that the court abused its discretion in refusing to admit the excerpts.

The defendant also attempted to admit two videotapes depicting the proper way to conduct physical examinations. The defendant wanted to offer these videotapes during his direct examination of Roux in order to assist her with her testimony. The state filed a motion in limine to preclude the defendant from using the two videotapes. The state objected on the grounds that the videotapes were irrelevant, hearsay and not authenticated. In opposition, the defendant argued that the videotapes were relevant in that they would assist the jury

in determining whether he had conducted his examinations properly. In addition, the defendant admitted that the videotapes were out-of-court statements, but he claimed that the videotapes were not being offered for the truth of what they were asserting. He also stated that even if they were deemed hearsay, experts are entitled to rely on hearsay under the Connecticut Code of Evidence. After viewing the videotapes, the court granted the state's motion in limine to preclude the introduction of the videotapes. The court held that it was "of the opinion that the tapes as offered are, in fact, not relevant to the issues of this case, and, more importantly, they might be misleading to the jury." Following our own viewing of the videotapes, we conclude that the court abused its discretion in precluding the videotapes.

As we reasoned with the treatise excerpts, the crucial issue in this case was whether the examinations the defendant performed were medically proper. Therefore, the videotapes, depicting a proper examination of the lungs and thorax, would have assisted the jury in deciding this material issue. Under § 4-1 of the Connecticut Code of Evidence, these videotapes were relevant. Neither of the videotapes, however, was relevant in its entirety. For instance, some parts of the videotapes discuss background information or examination information, which is not relevant to the issue of whether the defendant performed a medically proper pulmonological examination. Therefore, only certain parts of each videotape were relevant.

The court also concluded, however, that the videotapes might mislead the jury. We do not agree. The videotapes were relatively brief and fairly easy to comprehend. At oral argument before this court, the state argued that the videotapes would prove to be misleading for the jury because there would be no expert to guide their viewing of the videotapes. We see no

reason, however, and the state could cite no reason, why the videotapes could not have been shown during expert testimony at which point both the prosecutor and the defendant's attorney could have asked the experts questions regarding the videotapes to avoid any potential confusion. Because portions of the videotapes were relevant and did not have a tendency to mislead the jury, we conclude that the court abused its discretion in failing to admit the relevant portions of the videotapes into evidence.

Having concluded that the court's exclusion of the treatise excerpts and the relevant portions of videotapes constituted an abuse of discretion, we now must determine whether the error was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006). Furthermore, "nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357.

We conclude that the defendant has met his burden of proving that the error was harmful. Therefore, we cannot conclude that we have a fair assurance that the error did not substantially affect the verdict. The treatise excerpts and videotapes were critical to the main issue in the case, namely, whether the examinations performed by the defendant were medically proper. Furthermore, there was not overwhelming evidence of guilt against the defendant. Compare *State* v. *Sandoval*, 263 Conn. 524, 549, 821 A.2d 247 (2003) (exclusion of evidence, though abuse of discretion, not harmful because evidence only marginally or minimally significant and evidence against defendant strong). In contrast, the jury found the evidence closely balanced, which is evidenced by its having found the defendant

not guilty relative to D. The treatise excerpts and the videotapes may have had a tendency to cast doubt on the state's claim that the examinations performed by the defendant were medically improper. Therefore, the presentation of the treatise excerpts and videotapes could have substantially affected the verdict. As a result, we conclude that the court's exclusion of the proffered evidence constituted an abuse of discretion, which proved harmful to the defendant. Because the court's failure to admit the evidence was harmful, we reverse the convictions and grant new trials.

We conclude that the court improperly consolidated the three cases for trial and excluded evidence. As a result, we reverse the judgments with respect to J and M and grant new trials.

The judgments are reversed and the cases are remanded for new trials.

In this opinion FLYNN, C. J., concurred.

LAVINE, J., concurring. I agree that the conviction of the defendant, Sushil Gupta, should be reversed and a new trial ordered because the trial court excluded evidence in the form of instructional videotapes and learned medical treatises. I agree that these rulings deprived the defendant of the right to present a defense to the serious charges against him.

I am not persuaded, however, that it was improper for the court to deny the defendant's motion to sever the charges related to M, one of the victims of the alleged sexual assaults at issue in this case. As the majority notes, in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), our Supreme Court set out three factors a trial court should consider in deciding whether severance is required. The second factor is "whether the crimes were of a violent nature or concerned brutal

or shocking conduct on the defendant's part . . . ." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 375, 852 A.2d 676 (2004). With respect to M, the evidence of the defendant's conduct significantly was different in degree, but deeply offensive as it was, I cannot conclude that it was so different in kind as to fit within the second *Boscarino* factor. Stated otherwise, the fact that the evidence as to M was more compelling or graphic does not, in my view, render the charge so shocking that it necessarily will overwhelm the jury's ability to be fair and to evaluate each charge separately.

It is true that in *Ellis*, our Supreme Court decided that the trial court had abused its discretion because the defendant's abuse of one of the victims was "substantially more egregious"; id., 378; than the abuse of the other two victims in that case. The *Ellis* court also determined, however, that "the [trial] court's instructions to the jury were insufficient to cure the substantial prejudice to the defendant that resulted from the improper joinder." Id., 369. In this case, the court repeatedly and emphatically instructed the jury that it must evaluate each charge separately.[1] I am aware that such an instruction may be difficult for a jury to follow in a case such as this, but I am not willing to conclude that it is impossible.

While I do not agree with the majority's conclusion that the court's denial of the motion to sever was reversible error given the facts of this case, I do share the

---

[1] For example, the court charged in part: "Now, these informations pertain to three separate and distinct cases which have been consolidated for trial. You must infer nothing from that consolidation. It is essentially for the purpose of judicial efficiency and nothing more. It is of the utmost importance that you keep each alleged incident separate and distinct from one another. You must keep them separate in your evaluation of the facts and separate in your minds, and the determination of your verdict. You must not mix the evidence of one incident with the evidence of another."

majority's concern that the cumulative impact of charges, such as those present in this case, often may overwhelm the jury's ability to be fair to a criminal defendant. Merely because charges *can* be joined under the law, for reasons of judicial economy, does not mean that they *should* be. If the trial court harbors doubts that a jury fairly can assess the guilt of a defendant due to the aggregation of charges against him, the court should not hesitate to exercise its discretion in favor of severance. Judging is an intensely human process. Judicial economy, as important as it is, should never trump justice.