# STATE OF CONNECTICUT *v.* LAMONT FIELDS
## (SC 18457)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan,
Eveleigh and Vertefeuille, Js.

Argued January 10—officially released August 30, 2011

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, former state's attorney, and *Eva Lenczewski*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Lamont Fields, guilty of two counts of kidnapping in the second degree in violation of General Statutes § 53a-94, one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective sentence of fifty-three years imprison-

ment.[1] On appeal,[2] the defendant claims that (1) he is entitled to a new trial on one of the two kidnapping counts because the trial court improperly failed to instruct the jury in accordance with *State* v. *Salamon*, 287 Conn. 509, 550, 949 A.2d 1092 (2008), which bars a jury from finding a defendant guilty of kidnapping if it finds that the restraint used in connection therewith is merely incidental to the restraint used in the commission of another offense, (2) the trial court improperly instructed the jury with respect to the crime of risk of injury, and (3) the risk of injury statute is unconstitutionally vague as applied to his conduct.[3] We agree with the defendant's claim of instructional impropriety with respect to the one kidnapping count and, therefore, reverse the judgment of the trial court as to that count. We reject the defendant's remaining claims, however, and, accordingly, we affirm the trial court's judgment in all other respects.

The jury reasonably could have found the following facts. In July, 2005, Marilyn Cortes ended an abusive relationship with the defendant and moved from their shared residence to the home of her daughter, Marilyn (Mary) Razek, in the town of Naugatuck. Mary Razek's

[1] The trial court sentenced the defendant to five years imprisonment on the count of risk of injury to a child, twelve years imprisonment on one of the kidnapping counts, eighteen years imprisonment on the other kidnapping count, and eighteen years imprisonment on the count of assault in the first degree, all of the terms of imprisonment to run consecutively.

[2] The plaintiff appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The defendant also initially claimed that (1) the trial court improperly permitted the state to introduce evidence of his prior misconduct, (2) the police improperly failed to advise him of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 444–45, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to questioning him, and (3) the trial court improperly failed to instruct the jury on the other kidnapping count in accordance with *Salamon*. The defendant subsequently withdrew these claims, however.

husband, Tarrik Razek,[4] Tarrik Razek's brother, Taoufik Razek, and Taoufik Razek's one year old son, E,[5] also resided in the home.[6] Shortly before ending her relationship with the defendant, Cortes and the defendant had an argument during which the defendant pushed Cortes to the floor of their apartment, choked her, stabbed the floor around her body with a knife and then dragged her up the stairs to her bedroom. Despite this violent altercation, Cortes continued to have feelings for the defendant and therefore sought to end the relationship on good terms. To that end, she allowed the defendant to keep one of her two automobiles, a Ford Contour, so that he would have transportation to look for a job. She also spoke to him on her cell phone regularly following her move to Naugatuck, and she communicated with him, as well, on his frequent trips to visit her at her place of employment. Cortes did not inform the defendant of her new home address, however, because she did not want him to know where she was living. In fact, whenever she drove to her home in Naugatuck, she kept a close eye on the rearview mirror to make sure that the defendant was not following her.

Mary and Tarrik were married on August 27, 2005, and left shortly thereafter for their honeymoon. The day after they departed, Cortes awoke from a nap to find the defendant standing in E's room. Cortes told the defendant that he was not allowed in the house and that he must leave immediately. The defendant responded that he was thinking of moving out of state and that he wanted to talk to her about that possibility. Cortes replied that she would meet the defendant later

---

[4] Mary Razek and Tarrik Razek were not married when Cortes moved in with them but married shortly thereafter.

[5] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the child victim by name. See General Statutes § 54-86e.

[6] In the interest of simplicity, we hereinafter refer to Mary Razek, Tarrik Razek or Taoufik Razek individually by his or her first name only.

that evening for dinner and that they could speak then. In order to appease the defendant, she offered to let him take her other automobile, a Cadillac, which he did. Cortes later met the defendant for dinner as planned.

The next morning, on August 29, 2005, the defendant again appeared at Cortes' home. This time, Cortes allowed him inside, and the defendant stayed for approximately twenty minutes. Later that day, Taoufik discovered that $500 in cash was missing from the bedroom that Mary and Tarrik shared.[7] When Taoufik informed Cortes of the missing money, she immediately called the defendant and accused him of taking it. She also demanded that he return her Cadillac and threatened to call the police if he did not.[8] After his conversation with Cortes, the defendant called the house repeatedly throughout the afternoon and spoke to Taoufik several times. Although Taoufik did not know the defendant personally, he had seen him on a few occasions in Cortes' company. The two men got into a heated argument during one of the telephone calls, and Taoufik told the defendant that, if he did not return the money within two days, he would call the police. Although, at first, the defendant denied taking the money, he later admitted to Taoufik that he had done so.

The following morning, on August 30, 2005, the defendant called Taoufik to inform him that he had the money and that he would meet him at a coffee shop in the city of Waterbury to return it. Shortly after Taoufik left the house to meet the defendant, the defendant called Cortes to ask whether Taoufik had left, and she told him that he had. The defendant never intended to meet

---

[7] Tarrik had left the money, along with several checks, on top of a television. Tarrik and Mary had received the money and the checks as wedding gifts.

[8] At some point before the next day, the defendant had returned the Cadillac to Cortes, although it is not clear from the record how and when he did.

Taoufik but, rather, used the meeting as a pretext to lure him away from the house. Once he was sure that Taoufik was gone, the defendant drove to Cortes' house with another man identified only as Darryl.[9] When the two men arrived at the house at approximately 10:30 a.m., Darryl dropped the defendant off in the driveway and then drove to a nearby gas station to wait for him. The defendant entered the home unannounced and quickly confronted Cortes, whom he forced at gunpoint into her bedroom. The defendant proceeded to bind Cortes' wrists and to cover her mouth with duct tape.

While the defendant was restraining her, Cortes screamed, "[t]he baby, the baby," and pleaded with the defendant not to take her from the house because E, who was asleep in his crib at the time, would be left alone. The defendant ignored Cortes' pleas, took the keys to her Cadillac from her dresser and dragged her outside. After placing Cortes in the front passenger seat of the Cadillac, the defendant lowered the seat so that she would not be visible from the street and threatened that he would hurt her if she tried to sit up. The defendant drove the Cadillac to the gas station where Darryl was waiting, picked him up, and then drove Cortes and Darryl back to Cortes' house. The entire trip took approximately twenty-five minutes. Upon returning to the house, the defendant removed the duct tape from Cortes' mouth. Shortly thereafter, E began to cry, and the defendant removed the duct tape from Cortes' wrists so that she could attend to E. From E's bedroom, Cortes could hear the defendant and Darryl discussing their plan to confront Taoufik upon his return to the house.

When the defendant failed to show up at the coffee shop, Taoufik tried several times to reach Cortes on his cell phone. He grew concerned when she did not

---

[9] The record does not reveal Darryl's last name.

answer and decided to return home. As soon as Taoufik entered the house, he was confronted by the defendant, who struck him repeatedly on the head and in the face with a BB gun. The first blow broke Taoufik's nose and caused him to fall. The defendant then dragged Taoufik into a nearby bathroom and continued to assault him. While striking Taoufik, the defendant yelled, "[l]ook at me, motherfucker. I'm from the street. . . . You don't fuck with me or talk to me like that." Cortes attempted to call the police, but Darryl prevented her from doing so, and when she tried to intervene to stop the assault, the defendant struck her in the face with the BB gun. At some point, Darryl told the defendant that he should stop assaulting Taoufik. By then, Taoufik had lost a significant amount of blood and was drifting in and out of consciousness. The defendant told Darryl, "close the bathroom door, because I'm about to finish this motherfucker right now." Taoufik understood this to mean that the defendant was going to kill him, and he urged the defendant not to do it in front of his son, E, whom he believed to be nearby.

The defendant stopped the assault at this point, and either the defendant or Darryl wrapped a towel over Taoufik's head, dragged him outside, and placed him in the backseat of the Cadillac.[10] At or around that time, the defendant told Cortes that he "[did not] know why [he was] doing this and [that he was] sorry." Thereafter, the defendant got into the front passenger seat of the Cadillac and Darryl got into the driver's seat. Darryl tried to lock the doors but was unfamiliar with the controls and inadvertently lowered the car windows. Realizing that the back door was unlocked, Taoufik opened the door and escaped from the vehicle before Darryl drove away. He then ran inside the house,

---

[10] As we explain more fully in part I of this opinion, there was conflicting testimony as to whether Darryl or the defendant dragged Taoufik outside and placed him in Cortes' Cadillac.

grabbed E and his cell phone, and retreated to the back of the house to call the police.[11]

The defendant was arrested in the city of Hartford later that evening and was transported to the Naugatuck police department where, after being advised of his *Miranda* rights,[12] he confessed to assaulting Taoufik. The defendant subsequently was charged with two counts of kidnapping in the second degree,[13] and one count each of burglary in the first degree, assault in the first degree, risk of injury to a child, larceny in the third degree and larceny in the fifth degree. The jury found the defendant guilty of the kidnapping, assault and risk of injury charges, found him not guilty of the larceny charges, and was unable to reach a verdict as to the burglary charge. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that he is entitled to a new trial on the charge relating to the kidnapping of Taoufik because the trial court failed to instruct the jury, in accordance with *Salamon*, that it could not find him guilty of the crime of kidnapping unless it found beyond a reasonable doubt that the restraint or force involved in the alleged kidnapping was not merely

[11] Taoufik subsequently was transported to the hospital, where he was treated for a broken nose, numerous broken teeth, a laceration to his scalp and a fracture to the frontal bone, above one of his eyes.

[12] *Miranda* v. *Arizona*, 384 U.S. 436, 444–45, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[13] The defendant was charged in one count with the kidnapping of Cortes and in another count with the kidnapping of Taoufik. On appeal, the defendant challenges his conviction relating to the kidnapping of Taoufik, for which he was sentenced to a term of imprisonment of eighteen years, but he does not challenge his conviction relating to the kidnapping of Cortes. See footnote 3 of this opinion.

incidental to the underlying assault of Taoufik.[14] The state acknowledges that, as a general matter, a defendant who is alleged to have committed a kidnapping and another underlying offense is entitled to an incidental restraint instruction in accordance with *Salamon* and, further, that the trial court gave no such instruction in the present case. The state contends, however, that we should reconsider and overrule our holding in *Salamon* that such an instruction must be given even when, as in the present case, the underlying offense does not require that the state prove restraint as an element of that offense. Alternatively, the state claims that the trial court's failure to give a *Salamon* instruction was harmless beyond a reasonable doubt because no juror reasonably could have found that the defendant did not intend to prevent Taoufik's liberation for a longer period of time or to a greater degree than that which was necessary to commit the underlying assault. We decline the state's invitation to limit our holding in *Salamon* and we also conclude that the state cannot establish that the omission of a *Salamon* instruction in the present case was harmless beyond a reasonable doubt.

"It is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for

---

[14] We note that the trial in the present case predated the issuance of our opinion in *Salamon* and, further, that the defendant's claim under *Salamon* is unpreserved. Even though the defendant failed to preserve the issue at trial, "our interpretation of the kidnapping statutes in *Salamon* may be applied to the present case because of the general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending . . . ." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 454, 10 A.3d 942 (2011). Because the defendant's claim raises an issue of constitutional magnitude and the record is adequate for review of the claim, we address it in accordance with *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which governs our consideration of unpreserved constitutional claims.

determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Citation omitted; internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 252, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "A jury instruction that improperly omits an essential element from the charge constitutes harmless error [only] if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 232–33, 751 A.2d 800 (2000).

In *State* v. *Salamon*, supra, 287 Conn. 514, 542, we overruled our long-standing interpretation of our kidnapping statutes, General Statutes §§ 53a-91 through 53a-94a, as encompassing restraints that were incidental to the commission of another substantive offense, such as robbery or sexual assault. We ultimately concluded that "[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. When, as in the present case, a defendant is charged with kidnapping in conjunction with other crimes, "the jury

must be instructed that, if it finds that the defendant's restraint of the victim was merely incidental to the defendant's commission of another crime against the victim . . . then it must find the defendant not guilty of the crime of kidnapping." Id., 550.

As we emphasized in *Salamon*, however, "a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." Id., 547–48.

Ordinarily, therefore, a defendant who has been charged with a kidnapping that also involves another, underlying offense is entitled to an incidental intent instruction in accordance with *Salamon*. The state

maintains, however, that when, as in the present case, restraint is not an element of the underlying offense, there is no sound reason to require such an instruction. Specifically, the state asserts that the primary consideration that prompted this court to reconsider its prior interpretation of the kidnapping statutes, namely, the fact that the legislature did not intend to punish as a kidnapping those restraints that are merely incidental to the commission of another crime, simply is not implicated when restraint of the victim is not an element of the underlying offense.

We reject the state's contention because we disagree with its premise that the rationale of *Salamon* is not implicated merely because restraint of the victim is not an essential element of the underlying offense. On the contrary, restraint may be used in the commission of the underlying offense, including assault, as in the present case, even though it is not an element of that offense. Thus, depending on the facts of the underlying crime, the fact finder reasonably might conclude that the kidnapping was merely incidental to the underlying crime irrespective of whether that crime requires the use of restraint. A *Salamon* instruction is necessary in such cases to ensure that the defendant is convicted of kidnapping only when the restraint that forms the basis of the kidnapping charge has criminal significance separate and apart from that used in connection with the underlying offense. Indeed, it was a kidnapping conviction predicated on conduct constituting an uncharged assault that persuaded us, in *Salamon*, to reconsider our prior interpretation of the kidnapping statutes; see id., 516–17; and, ultimately, to determine that that interpretation had led to unintended results in cases in which the restraint used to support a kidnapping conviction was merely incidental to the commission of another crime. See *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 773–74, 12 A.3d 817 (2011) ("the court's

thorough review of the legislative history of [General Statutes] § 53a-92 [a] [2] [A] in *Salamon* made clear that the legislature never intended that a single crime be subject to dual liability, both as assault and as kidnapping, without evidence that the petitioner intended to restrain the victim more than was necessary to effect the underlying assault"); see also *State* v. *Salamon*, supra, 287 Conn. 524–25, 527–28 n.17, 543–44. Although it is true, of course, that not every assault involves an appreciable restraint of the victim, many do, and, in those circumstances, we see no reason why a defendant should be denied the benefit of a *Salamon* instruction simply because the state is not required to prove restraint of the victim as an element of the assault.[15]

---

[15] The state suggests that our decision in *State* v. *Alvarez*, 257 Conn. 782, 778 A.2d 938 (2001), provides support for its proposed modification of *Salamon*. In *Alvarez*, we applied the test set forth in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932), in determining whether two offenses constitute the same offense for double jeopardy purposes. *State* v. *Alvarez*, supra, 789 ("The traditional approach to analyzing whether two offenses constitute the same offense [for purposes of the double jeopardy clause] was set forth in *Blockburger* . . . . [When] the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . The issue, though essentially constitutional, becomes one of statutory construction." [Citations omitted; internal quotation marks omitted.]). In doing so, we overruled *State* v. *Lonergan*, 213 Conn. 74, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990), in which we had concluded that successive prosecutions were barred under the double jeopardy clause "[i]f the same evidence offered to prove a violation of the offense charged in the first prosecution is the sole evidence offered to prove an element of the offense charged in the second prosecution . . . regardless of whether either offense requires proof of a fact that the other does not." (Internal quotation marks omitted.) Id., 81; see *State* v. *Alvarez*, supra, 794 (expressly overruling *Lonergan*).

The state asserts that "[t]he *Salamon* rule is analogous to the problematic approach initially taken by this court [in *Lonergan*] with respect to double jeopardy analysis" and "is as misguided in [this] context as it was in *Lonergan* as a means of discerning legislative intent." We disagree with the state's argument, which apparently would require the wholesale overruling of our holding in *Salamon*, because we see no meaningful relationship between our analysis in *Alvarez* and our analysis in *Salamon*. We employed the

Because we conclude that the defendant was entitled to a *Salamon* instruction under the facts of the present case, we turn next to the state's alternative contention that the trial court's failure to give such an instruction was harmless beyond a reasonable doubt. As we previously discussed, the evidence presented at trial established that the defendant laid in wait for Taoufik at his home in Naugatuck and then assaulted him upon his arrival there. When Taoufik collapsed from the defendant's initial blow, the defendant dragged him into a nearby bathroom and continued the assault. According to Taoufik, when the assault finally ended, the defendant placed a towel over Taoufik's head, dragged him outside to Cortes' car and forced him into the backseat. Taoufik acknowledged, however, that, because the towel was draped over his head, his vision was obscured and he was able to see only the ground around his feet. Cortes' testimony differed from Taoufik's with respect to certain of the events following the assault. In particular, Cortes testified that, after the assault had stopped, *Darryl*, rather than the defendant, "grab[bed]" Taoufik and took him outside to the car while the defendant remained inside the house. According to Cortes, at that time, she and the defendant had a brief conversation during which the defendant indicated that he was "sorry" for his conduct and stated, "I don't know why I'm doing this . . . ."

*Blockburger* analysis in *Alvarez* to determine whether the legislature intended for two offenses to be punished separately for purposes of implementing the protections of the double jeopardy clause, a legal determination to be made by the court upon review of the elements of the two offenses. The purpose of a *Salamon* instruction, by contrast, is to ensure that the crime of kidnapping is not enlarged in a manner unintended by the legislature, a factual determination to be made by the jury on a case-by-case basis. As with any jury instruction, the instruction mandated by *Salamon* is designed to provide guidance to the jury so that it may reach a verdict in accordance with applicable law, and we remain persuaded that the *Salamon* instruction is necessary to achieve that end.

At the close of evidence, in accordance with our pre-*Salamon* case law, the trial court instructed the jury in relevant part: "[A] person is guilty of kidnapping in the second degree when he abducts another person. . . . [F]or you to find the defendant guilty of this charge, the state must have proved beyond a reasonable doubt that the defendant abducted [Taoufik]. Abduct means to restrain a person with intent to prevent [his] liberation by either . . . secreting or holding [him] in a place where [he] is not likely to be found, or . . . using or threatening to use physical force or intimidation. . . . There is neither any time requirement for the restraint nor any distance requirement for the asportation or carrying away to constitute the crime of kidnapping."

The state contends that the defendant is not entitled to a new trial on the challenged kidnapping count because no juror reasonably could have found that the restraint or force that the defendant used to move Taoufik from the house to the car was merely incidental to the restraint or force that the defendant used in the commission of the assault, in view of the fact that the assault concluded before Taoufik was taken to the car. We might agree with this contention were it not for the conflicting testimony of Cortes and Taoufik with respect to the identity of the person who forcibly moved Taoufik to Cortes' Cadillac following the assault. If the jury credited Cortes' testimony that Darryl, rather than the defendant, was responsible for taking Taoufik to the vehicle—and there was strong reason for the jury to credit Cortes' version over Taoufik's version because, when Taoufik was being moved, his range of vision was impaired by the towel that had been placed over his head—the jury might have found the defendant guilty of kidnapping Taoufik solely on the basis of the defendant's act of restraining Taoufik while committing the assault.[16] In that event, a *Salamon* instruction would

---

[16] We note that the information did not specify whether the kidnapping charge relating to Taoufik was predicated on the movement and restraint

have been critical because, under *Salamon*, the defendant was entitled to have the jury decide whether his restraint of Taoufik during the assault had independent criminal significance as a kidnapping. In other words, under the factual scenario described by Cortes, the jury would have been required to determine whether the defendant's restraint of Taoufik in connection with his alleged kidnapping of Taoufik was merely incidental to the defendant's restraint of Taoufik in connection with the assault. In the present case, however, there was nothing in the jury instructions to prevent the jury from finding the defendant guilty of kidnapping even if it found that the defendant's restraint of Taoufik was merely incidental to the defendant's restraint of Taoufik in connection with the assault, a result that would have been proper under our case law interpreting the kidnapping statutes in effect at the time of the defendant's trial. See, e.g., *State* v. *Winot*, 294 Conn. 753, 761, 988 A.2d 188 (2010) (explaining that, for "many years" prior to this court's decision in *Salamon*, "Connecticut's appellate courts routinely rejected challenges to kidnapping convictions based on claims that the movement or confinement at issue was . . . merely incidental to the commission . . . of another assault type crime [against the victim]").

In rejecting the state's claim that the trial court's failure to give a *Salamon* instruction was harmless, we are mindful that the state charged the defendant with the actual kidnapping of Taoufik, and not with conspiracy to kidnap Taoufik or with being an accessory to his kidnapping. As a consequence, the state was required to prove that the defendant himself, acting alone or with Darryl, restrained Taoufik after assaulting him by moving him from the house to the car against Taoufik's will.

that had occurred during the assault, after the assault, or both, and the assistant state's attorney did not shed any light on that issue during closing argument.

In light of Cortes' testimony that Darryl rather than the defendant had restrained Taoufik in such a manner, a *Salamon* instruction was necessary to inform the jury that it could not find the defendant guilty of kidnapping on the basis of conduct that constituted an assault only. Under the circumstances, therefore, the state cannot prevail on its claim that the trial court's failure to instruct the jury in accordance with *Salamon* was harmless beyond a reasonable doubt.[17]

## II

The defendant next contends that the trial court's instructions with respect to the offense of risk of injury

[17] At oral argument before this court, the state maintained that, even if the jury had found the defendant guilty of kidnapping Taoufik on the basis of the restraint that occurred during the commission of the assault, the trial court's failure to give a *Salamon* instruction nevertheless was harmless because no reasonable juror could have found that the defendant's restraint of Taoufik during the assault was merely incidental to or necessary for the commission of that offense. In support of this contention, the state relies on the fact that Taoufik was forced to remain inside his home, where the assault took place, for at least several hours. Although we agree with the state that a properly instructed jury reasonably *could* have concluded that the defendant's restraint of Taoufik lasted for a period of time that was longer than necessary for the commission of the assault, the state has failed to establish that the jury reasonably could *not* have reached a contrary conclusion. This is so, first, because the record contains no clear indication as to when Taoufik arrived home and, second, because it appears that the assault took place, on and off, from the time Taoufik entered his home until he was dragged outside and placed in Cortes' Cadillac. But cf. *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009) (omission of *Salamon* instruction constituted harmless error because state presented overwhelming evidence that defendant abducted victim and drove around with her in his car for more than three hours before committing any other crimes against her); *State* v. *Nelson*, 118 Conn. App. 831, 861–62, 986 A.2d 311 (failure to give *Salamon* instruction harmless because evidence established that defendant restrained victim in car for several hours after assaulting victim at different location), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010). Thus, the jury reasonably could have found that the restraint that the defendant used in connection with his alleged kidnapping of Taoufik was merely incidental to the restraint that the defendant used in connection with the assault.

to a child; see General Statutes § 53-21 (a) (1);[18] were constitutionally defective because they failed to adequately inform the jury of the essential elements of that offense.[19] The defendant raises two claims of instructional impropriety. First, the defendant asserts that the trial court's instruction that the state must prove that he "wilfully created a situation that posed a risk to the child's health" improperly diluted the state's burden of proof because that language does not carry with it the same degree of certitude as the actual language of § 53-21 (a) (1), which requires proof that the child's health is "likely to be injured . . . ." The defendant also contends that the trial court improperly instructed the jury with respect to the intent necessary to violate § 53-21 (a) (1) by its use of the disjunctive "or" in its instruction that "[t]his is the conduct of a person [who] is deliberately indifferent to *or* creates a situation detrimental to the child's physical welfare." (Emphasis added.) The defendant maintains that the court's use of "or" improperly permitted the jury to find him guilty of risk of injury to a child if it found that he had created a situation that was detrimental to E's welfare, irrespective of whether the jury found that his conduct was wilful. We are not persuaded by either of the defendant's contentions.

The following procedural history is relevant to our disposition of these claims. The state charged the defendant with risk of injury to a child predicated on the fact

[18] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."

[19] The defendant failed to raise his claim of instructional impropriety in the trial court and, therefore, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We review his unpreserved claim because the record is adequate for review and the claim is of constitutional magnitude.

that E had been left alone at home for approximately twenty-five minutes when the defendant abducted Cortes and forced her to accompany him to the gas station to meet Darryl. In its jury instructions on that charge, the trial court stated in relevant part: "[T]he state . . . accuse[s] the [defendant] of the crime of risk of injury to a [child] in violation of § 53-21 (a) (1) . . . and charges that . . . the [defendant] wilfully and unlawfully caused and permitted a child [namely, E] . . . to be placed in such a situation that the life and limb of such child was endangered and the health of such child was likely to be injured . . . .

"Section 53-21, which defines the crime of risk of injury to a [child, provides]: Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such situation that the life or limb of such child is endangered and the health of such child is likely to be injured shall be punished. The intent of the statute is to protect the physical health and well-being of children.

"To find the defendant guilty of this charge, the state must have proved beyond a reasonable doubt, one, that, at the time of the incident, [E] was under the age of sixteen years, and, two, that the defendant wilfully and unlawfully caused or permitted [E] to be placed in a situation that endangered his life or limb or was likely to injur[e] his health.

"First, you must find that the state proved beyond a reasonable doubt that [E] was under the age of sixteen years [at the time of the alleged crime]. Second, you must find . . . beyond a reasonable doubt that . . . the defendant acted wilfully and unlawfully in causing or permitting [E] to be placed in a situation that his life or limb was endangered or his health was likely to be injured.

" 'Wilfully' means intentionally or deliberately. 'Unlawfully' means without legal right or justification. This is the conduct of a person [who] is deliberately indifferent to or creates a situation detrimental to the child's physical welfare.

"Causing a situation to arise within the meaning of the statute requires conduct by the defendant that brings about or permits that . . . situation to arise when the defendant had such control over the child that the defendant might have reasonably . . . prevented it. The state must have proven that [E's] life or limb was endangered or [that] his health was likely to be injured as a result of the situation brought about by the defendant.

" 'Health' means the condition of being sound or whole in body or well-being. 'Likely' in the phrase 'likely to be injured' connotes a probability. The state does not have to prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health."

We employ a well established standard of review for claims of instructional impropriety. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we

must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 272–73, 962 A.2d 781 (2009).

"Under the situation portion of § 53-21 [(a) (1)], the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals. . . . The situation portion of § 53-21 [(a) (1)] encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." (Internal quotation marks omitted.) *State* v. *Scruggs*, 279 Conn. 698, 713, 905 A.2d 24 (2006). "This court previously has recognized that [t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults. . . . Our case law has interpreted § 53-21 [(a) (1)] as comprising two distinct parts and criminalizing two general types of behavior likely to injure physically or to impair the morals of a [child] under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the [child's] moral or physical welfare . . . and (2) acts directly perpetrated on the person of the [child] and injurious to his moral or physical well-being. . . . Thus, the first part of § 53-21 [(a) (1)] prohibits the creation of situations detrimental to a child's welfare, [whereas] the second part proscribes injurious acts directly perpetrated on the child." (Citation omitted; internal quotation marks omitted.) Id. The present case involves that portion of § 53-21 (a) (1) relating to the creation of a situation likely to result in injury to the child's health. See id.

Upon review of the trial court's instructions, we are persuaded that there is no reasonable possibility that the court's instruction that the state need only "prove

that the defendant wilfully created a situation that posed a risk to the child's health" led the jury to believe that it could find the defendant guilty of risk of injury to a child if it found that his conduct created a mere possibility of risk rather than a likelihood of such risk. It is apparent that the challenged portion of the instructions was designed to clarify the instruction immediately preceding it, namely, that the state is required to prove only that the defendant's conduct created a situation that posed a *risk* of injury to the child, not that the defendant's conduct caused the child to suffer an *actual* injury. Indeed, as the state notes, this court repeatedly has used the same language to explain the state's burden under the situational provision of § 53-21 (a) (1). See, e.g., id. ("Under the situation portion of § 53-21 [(a) (1)], the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals." [Internal quotation marks omitted.]); *State* v. *Padua*, 273 Conn. 138, 148, 869 A.2d 192 (2005) (same).

Moreover, even if the phrase "created a situation that posed a risk to the child's health," standing alone, possibly might be read to connote a risk that is less than probable, we do not review challenged jury instructions individually or in isolation. Rather, our role is to examine them in the context of the entire charge to determine whether they provided adequate guidance to the jury with respect to the applicable legal principles. In the present case, the trial court repeatedly emphasized that the state must prove beyond a reasonable doubt that E was in fact "endangered," or that his health was "likely to be injured" as a result of the defendant's conduct. The trial court also instructed the jury that the word " 'likely' in the phrase 'likely to be injured' connotes a probability." Accordingly, when the instructions are considered as a whole, it is clear that they

provided ample guidance to the jury that, to find the defendant guilty of risk of injury to a child, it must have found that the defendant's conduct had created a likelihood of harm rather than a mere possibility of harm.

We also find no merit in the defendant's contention that the trial court's use of the word "or" in its instruction that "[t]his is the conduct of a person [who] is deliberately indifferent to or creates a situation detrimental to the child's physical welfare" invited the jury to return a verdict of guilty if it found that the defendant had created a situation detrimental to E's welfare regardless of whether the defendant's conduct was wilful. As we previously indicated, the trial court instructed the jury that, to find the defendant guilty of risk of injury to a child, it must find "that the state proved beyond a reasonable doubt that the defendant acted wilfully and unlawfully in causing or permitting [E] to be placed in a situation that his life or limb was endangered or his health was likely to be injured." The court then stated: " 'Wilfully' means intentionally or deliberately. 'Unlawfully' means without legal right or justification. This is the conduct of a person [who] is deliberately indifferent to or creates a situation detrimental to the child's physical welfare."

When the challenged language is viewed in context, it is apparent that "creates a situation detrimental to" following the disjunctive "or" modifies "conduct of a person . . . ." As with the previous instructional language that the defendant challenged, this language served to emphasize that the risk of injury statute criminalizes not only injurious acts perpetrated directly on a child but also wilful conduct that creates a *situation* inimical to a child's physical or moral welfare. Furthermore, even if the use of the disjunctive in this context conceivably could have created some ambiguity as to the intent required to commit the crime of risk of injury

to a child, the trial court instructed the jury no less than four times that it must find that the defendant acted "wilfully," which it defined as "intentionally or deliberately." In light of these clear and explicit instructions, we agree with the state that there is no possibility that the jury was led to believe that it could find the defendant guilty of risk of injury to a child upon proof that his conduct in causing E to be left alone for approximately twenty-five minutes was merely inadvertent. Consequently, the defendant cannot prevail on this claim of instructional impropriety.

## III

The defendant finally claims that § 53-21 (a) (1) is unconstitutionally vague as applied to his conduct because he reasonably could not have known that causing a one year old child to be left home alone in his crib for approximately twenty-five minutes falls within the ambit of the statutory prohibition.[20] We also reject this claim.

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [him], the [defen-

---

[20] The defendant failed to raise this claim at trial and now seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant is entitled to review of his vagueness claim under *Golding* because the record reveals the conduct that formed the basis of his conviction under § 53-21 (a) (1) and because the claim implicates the defendant's due process right to fair warning. See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 800–801, 640 A.2d 986 (1994).

dant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Citation omitted; internal quotation marks omitted.) *State* v. *Scruggs*, supra, 279 Conn. 709–10. Thus, even "[a] facially vague law may . . . comport with due process if prior judicial decisions have provided the necessary fair warning and ascertainable enforcement standards." (Internal quotation marks omitted.) *State* v. *Robert H.*, 273 Conn. 56, 67, 866 A.2d 1255 (2005).

Under General Statutes § 53-21 (a), "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the health of such child is likely to be injured" is guilty of a class C felony. We think that a person of ordinary intelligence would know that it is dangerous and unsafe to leave an infant alone and unattended for any appreciable period of time, let alone nearly one-half hour. Furthermore, in the present case, Cortes, who, at the time of the events in question, was caring for E, implored the defendant not to force her to leave the house because, if he did so, E would be left alone. Thus, the defendant was aware that E's caregiver was extremely concerned about leaving E by himself. As we recently have observed, "the fundamental pur-

pose of the void for vagueness doctrine is to ensure fair warning in order to avoid traps *for the innocent.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Winot,* supra, 294 Conn. 770. The defendant has advanced no plausible argument that, on August 30, 2005, "he acted in reliance on the belief that his conduct was lawful, or that a person of ordinary intelligence would have no reason to know that he was engaging in prohibited conduct." (Internal quotation marks omitted.) Id.

Moreover, on at least two occasions, the Appellate Court has considered and rejected claims that § 53-21 (a) (1) is unconstitutionally vague as applied to the conduct of a defendant who had been convicted under that statute for leaving a very young child or children unattended, without adult care or supervision. See *State* v. *Branham,* 56 Conn. App. 395, 397, 402, 743 A.2d 635 (defendant had fair notice that § 53-21 proscribes leaving three children, all under four years of age, home alone), cert. denied, 252 Conn. 937, 747 A.2d 3 (2000); *State* v. *George,* 37 Conn. App. 388, 390–91, 656 A.2d 232 (1995) (defendant had fair notice that § 53-21 proscribes leaving seventeen month old home alone). Although *Branham* and *George* involve factual scenarios that differ slightly from that of the present case, the conduct at issue in both *Branham* and *George* is sufficiently similar to the conduct of the defendant in this case that it placed him on notice that causing E to be left alone for an extended period of time was detrimental to E's safety and well-being, in violation of § 53-21 (a) (1).

We conclude, therefore, that the defendant's conduct with respect to causing E to be left alone for an extended period of time was unlawful under any interpretation of Connecticut law, and the defendant makes no persuasive argument to the contrary. "His position, reduced to its simplest terms, is that he had a right to expect that he would be convicted for kidnapping

[Cortes] only, rather than for kidnapping [Cortes and for risk of injury to a child]. This kind of reliance interest is not . . . entitled to a great deal of weight. When a person does an act that he well knows to be a violation of some law, and when a statute is later interpreted to cover his conduct in a way that does not do violence to the ordinary understanding of the English language, [the due process clause of] the [f]ourteenth [a]mendment is not offended." *Knutson* v. *Brewer*, 619 F.2d 747, 750 (8th Cir. 1980). Accordingly, we reject the defendant's vagueness challenge with respect to his conviction of risk of injury to a child.

The judgment is reversed only as to the conviction of kidnapping in the second degree relating to the defendant's alleged movement and restraint of Taoufik Razek and the case is remanded for a new trial on that charge; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.