# STATE OF CONNECTICUT *v.* SHAWN JORDAN
## (AC 29848)

Gruendel, Beach and Sullivan, Js.

Argued September 21, 2010—officially released May 31, 2011

*Mary Anne Royle*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Chris A. Pelosi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Shawn Jordan, appeals from the judgment of conviction, rendered after a jury trial, of one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), two counts of kidnapping in the second degree in violation of General Statutes § 53a-94 (a), two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). On appeal, the defendant claims that (1) he is entitled to a new trial on the kidnapping counts because the trial court's instruction did not comport with the requirement of *State* v. *Salamon*, 287 Conn. 509, 949

A.2d 1092 (2008), and (2) the trial court abused its discretion in refusing his request to instruct the jury on diminished capacity. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and one of the victims, D,[1] had known each other for nine years and had three children together. After the relationship ended, the defendant moved out of the home they had shared for over four years and returned his key. D also had the locks on the doors changed, but continued living in the home. D began dating E in April, 2004. In the early hours of June 19, 2004, the victims, D and E, were upstairs at D's home when they heard someone on the stairs. When D got out of bed to investigate, a light turned on in the stairwell to reveal the defendant. The defendant then pushed past D and entered the bedroom, carrying a gun in one hand and a stick in the other, and after a brief verbal exchange, the defendant began hitting E in the head with the stick. Though both victims begged the defendant to stop, he continued beating E. When the defendant briefly was interrupted by his son, D tried to run past the defendant and out of the house. After she ran down the stairs and reached the door, the defendant caught her and pulled her back upstairs by her hair to the bedroom where E lay incapacitated on the floor. The defendant hit D on the head with the stick, causing her to slump over onto the ground. The defendant then ordered her to clean blood off the walls, and he got a bucket of water and rags for her to use. Although D was slipping in and out of consciousness, the defendant ordered her to keep cleaning.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

While D was cleaning, the defendant continued to assault E, stomping on him and punching him. The defendant then forced E onto the bed and ordered D to sodomize him with a mop handle. When she refused, the defendant took out the gun and repeated the order. D complied, using very little force. The defendant then took the mop handle from D and continued to sodomize E with enough force to bend the handle. The defendant then ordered D to break the handle to make it jagged, and when she refused, he did it himself and reinserted it in E's rectum. When E began to scream, the defendant hit him in the head with the gun. The defendant also sodomized E with the stick that he had used to beat him.

The defendant left the room and returned with salt or pepper, which he poured on E's wounds. At some point during the night, he also urinated on E, poured bleach on him and took $500 from his pants pocket. The defendant then turned his attention to D, who he forced into the bathroom to take a shower, but because she could not stand, she lay in the bathtub. While she was there, she could hear that the defendant had returned to E and continued to stomp and to shout orders at him.

The defendant then ordered E to put on his pants and dragged him out of the house, leaving him across the street from the house on the strip of grass between the sidewalk and street. The defendant then returned to the house and moved D downstairs to the living room and laid her down on a sleeping bag while he went to clean the bedroom. When D asked the defendant to let her dial 911, he refused, but agreed to bring her to a hospital if she would promise not to implicate him in her injuries. The defendant then drove D to the hospital. E later was brought to the same hospital by ambulance. D eventually told the doctors what had caused her injuries, implicating the defendant.

## I

The defendant first claims that he is entitled to a new trial on the two kidnapping counts because the court did not instruct the jury that a conviction for kidnapping requires a finding that the victim "is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime." *State* v. *Salamon,* supra, 287 Conn. 547. The state does not dispute the applicability of *Salamon* to the present case, but contends that the court's failure to so instruct was harmless because the state offered sufficient evidence such that no reasonable jury could have concluded that the restraint of the victims by the defendant was merely incidental to the other crimes of assault and sexual assault. We agree with the state.

On December 17, 2007, the court instructed the jury on the elements necessary for the state to prove kidnapping in the second degree.[2] The defendant's appeal was filed on May 2, 2008. In *State* v. *Salamon,* supra, 287 Conn. 509, officially released on July 1, 2008, our Supreme Court considered our kidnapping statutes, holding that "[o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping

---

[2] The court explained that " '[a]bduct' means to restrain a person with the intent to prevent his or her liberation by using or threatening to use physical force or intimidation. The defendant does not need to actually use force; he need only threaten the use of force in such a manner that the complainant or complainants reasonably believed that the force would be applied to him or her if he or she sought to escape. . . . 'Restrain' means to intentionally restrict a person's movement in such a manner as to interfere substantially with his or her liberty by confining him or her in some place. This could either be a place where the restraint began or to a place where he or she had been moved or has been moved. Abduction and restraining must be intentional. There must be an intent to interfere substantially with the other person's liberty and an intent to prevent that person's liberation by using or threatening the use of physical force or intimidation."

and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. The defendant asserts, and the state does not contest, that the holding in *Salamon* retroactively applies to cases pending prior to its resolution. See *State* v. *Sanseverino*, 287 Conn. 608, 620 n.11, 949 A.2d 1156 (2008).

Because the state makes no argument that the instructions given in this case comported with the holding in *Salamon* or that *Salamon* does not apply to this case, we need only determine whether the error was harmful to the defendant. "It is well settled that an instructional impropriety that is constitutional in nature is harmful beyond a reasonable doubt, and, thus a reversible impropriety, when it is shown that it is reasonably possible . . . that the jury [was] misled. . . . In other words, the test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Citations omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 462–63, 978 A.2d 1089 (2009).

Since the release of the decision in *Salamon*, numerous cases have considered the question of whether a trial court's failure to provide the instructions required by *Salamon* harmed the defendant in those cases. "In *Sanseverino*, we relied on our opinion in *Salamon* to reverse the defendant's conviction of kidnapping in the first degree, reasoning that although the question of whether kidnapping may stand as a separate offense is

one for the jury . . . under the facts of the present case, no reasonable jury could have found the defendant guilty of kidnapping in the first degree on the basis of the evidence that the state proffered at trial. . . .

"Relying on *Salamon*, in [*State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008)], the court also reversed the defendant's kidnapping conviction. . . . There, the court found that because the jury was not instructed in accordance with *Salamon* concerning the crime of kidnapping, [t]he defendant therefore could have been convicted on the basis of conduct which, under *Salamon*, does not violate the kidnapping statute. . . . After reversing the defendant's kidnapping conviction, *DeJesus* next considered the appropriate remedy for the instructional impropriety identified in *Salamon* and *Sanseverino*, and concluded that in such situations, the appropriate remedy . . . is to reverse the defendant's kidnapping conviction and to remand the case to the trial court for a new trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 118 Conn. App. 140, 157–59, 983 A.2d 20 (2009), cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010).

In *State* v. *Hampton*, supra, 293 Conn. 456, the court determined that the lack of a *Salamon* instruction, though error, did not harm the defendant who was convicted of kidnapping in addition to other crimes. Similarly, in *State* v. *Nelson*, 118 Conn. App. 831, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010), this court affirmed the defendant's conviction for kidnapping in the first degree, holding that the lack of a *Salamon* instruction was harmless error. Id., 856. In both *State* v. *Hampton*, supra, 463, and *State* v. *Nelson*, supra, 860, the victims were confined for several hours. By contrast, in *State* v. *Thompson*, supra, 118 Conn. App. 144, where the confinement of the victim lasted for no longer than fifteen to twenty minutes, this court held that it was "unable to conclude that the evidence

. . . does not reasonably support a finding that the defendant's restraint of the victim was or was not so inextricably linked to the underlying crime itself." Id., 162. It therefore remanded the case for a new trial on the kidnapping charge. Id., 163.

The defendant argues that this case is distinguishable from *Nelson* and *Hampton* because the entire forty-five minute confinement of the victims was comprised of the defendant's assaultive action. There was, therefore, no period of time during which the victims were restrained for a greater degree than was necessary to commit the assaults. He also argues that because the victims were incapacitated by the assaults, he did not prevent their liberation, but rather they were restrained as a result of their injuries. We are not persuaded.

Our Supreme Court repeatedly has reaffirmed the principle that a kidnapping does not require a minimum time period of confinement. See *State* v. *Winot*, 294 Conn. 753, 767, 988 A.2d 188 (2010). Thus, the fact that the entire incident only lasted for forty-five minutes is not dispositive here. We must look to the record to determine whether the evidence reasonably could support the conclusion that the defendant's restraint of the victims was merely incidental to the assaults and sexual assault, and we conclude that it does not.

The record in this case shows that the defendant restricted the movement of the victims to a far greater degree than was necessary to assault them. The defendant correctly asserts that his assaultive actions were ongoing throughout the time he confined the victims; however, it is equally apparent that as he targeted one victim, the other was not free to leave. When D attempted to leave, the defendant dragged her back by her hair. He incapacitated her and brought her to a bathroom so that he could continue assaulting E.

The evidence further showed that when the defendant was not assaulting the victims, he controlled their movement and prevented them from leaving. He made them both clean blood off the walls. The record, therefore, does not allow the conclusion that the defendant's actions in restraining the victims were merely incidental to the assaults and sexual assault.

Even if we assume that the defendant is correct that his assaults incapacitated the victims, thereby preventing them from leaving, such a fact would not negate the evidence showing that the defendant restrained the victims to a greater degree than was necessary to commit the underlying crimes. The defendant did not assault them and leave them incapacitated. Rather, the defendant used the fact that they were incapacitated to his advantage in order to be able to assault one while the other was unable to move away to safety.

On the basis of the evidence before it, no reasonable jury could have failed to conclude that the restraint was to a greater degree than was necessary for the commission of the assaults; therefore, as in *Hampton* and *Nelson*, we conclude that the error by the court in failing to instruct the jury in accordance with *Salamon* was harmless.

## II

The defendant next claims that the court improperly refused to instruct the jury on the doctrine of diminished capacity, thereby impinging on the defendant's constitutional right to present a defense and misleading the jury on the element of intent. He argues that D's testimony that the defendant acted like "a maniac" while assaulting her and E was sufficient for a reasonable jury to conclude that he was so enraged that he could not form the specific intent required for the crimes charged, and he was, therefore, entitled to the

instruction on diminished capacity as he requested. We disagree.

At trial, two witnesses testified about the defendant's relationship with D,[3] evidence that the defendant argues established that the two had an ongoing relationship that would have given rise to his intense rage upon seeing D with E in a bedroom at D's home. Furthermore, both D and E testified that they were unable to reason with the defendant while he was attacking them, nor did he stop when his son asked him to stop. Finally, D testified that the defendant attacked her and E like "a maniac." The defendant argues that this evidence was sufficient to warrant an instruction by the court on his diminished capacity to form the requisite intent.

In his request to charge, the defendant asked the court to instruct the jury on each of the seven charges for specific intent crimes that "[b]ased on the evidence that has been presented in this case the defense maintains that the effect on the defendant of finding E and [D] together limited or impaired his mental faculties at the time of the incident. This requires that I instruct you on the legal doctrine of diminished capacity as it applies to this case. . . .

"The doctrine of diminished capacity means that if the defendant, because of a limited or impaired mental capacity, did not have that specific intent to commit the acts which comprise the crime [charged] because

---

[3] Jessica Santiago testified that she is the former girlfriend of the defendant's brother and, therefore, knew both the defendant and D at the time of the incident. Santiago stated that a few days prior to the alleged crimes, D introduced E to her as her boyfriend, and asked Santiago not to mention to E that the defendant "existed in her life still." D also told Santiago that she would make the defendant pay for what he had done to her.

Barbara McNair also testified for the defendant. She described being present at a family gathering that had occurred on June 18, 2004, testifying that both the defendant and D were at the same gathering. She further stated that she overheard a conversation between D and the defendant in which they agreed to meet later at D's house.

of a limited or impaired mental capacity, then the element of intent would not have been proven in this case." The court refused to give the requested instruction, instead giving the standard instruction on specific intent.[4] The defendant properly preserved the claim by taking exception to the given charge after it was delivered by the court.

"Evidence with regard to a defendant's mental capacity is relevant in any case where a specific intent is an essential element of the crime involved . . . . Such evidence is admitted not for the purpose of exempting a defendant from criminal responsibility, but as bearing upon the question of whether he possessed, at the time he committed the act, the necessary specific intent, the proof of which was required to obtain a conviction." (Citation omitted; internal quotation marks omitted.) *State* v. *Pagano*, 23 Conn. App. 447, 449, 581 A.2d 1058, cert. denied, 217 Conn. 802, 583 A.2d 132 (1990).

The defendant in the present case was charged with several specific intent crimes, and the defendant requested the diminished capacity instruction for each of the charges. "An instruction on diminished capacity would be warranted, therefore, if sufficient evidence was introduced to justify it. . . .

"The state had the burden of proving the element of intent beyond a reasonable doubt. . . . To warrant consideration of diminished capacity, however, the defendant must have presented evidence [that] might

---

[4] The court stated: "Intent relates to the condition of mind of the person who commits the act, their purpose in doing it. The law recognizes two types of intent, general intent and specific intent. General intent refers to engaging in conduct voluntarily but does not require that the action be taken with the objective of causing a specific result. On the other hand, specific intent is goal oriented conduct.

"As defined by our statutes, a person acts intentionally with respect to a result or to conduct when their conscious objective is to cause such result or to engage in such conduct. General intent is the intent to engage in conduct. Specific intent refers to and requires proof of engaging in conduct to achieve a specific result."

have raised a reasonable doubt as to the existence of the specified mental state." (Citations omitted; internal quotation marks omitted.) Id., 449–50.

In the present case, the court correctly concluded that the defendant was not entitled to the instruction on diminished capacity. The evidence that the defendant highlighted could only reasonably prove that he was very angry,[5] but it reveals nothing about his *capacity* for forming intent. The defendant cites no case, and research reveals none, for the proposition that rage, unconnected to any underlying mental disease or defect, falls within the doctrine of diminished capacity. We also do not agree with the defendant's argument that the jury was capable of forming that conclusion on its own without the help of expert testimony. Even if we agree with the defendant's interpretation of the law that an expert is not always needed to establish a diminished capacity, the essential missing element in the present case is a connection between the state of the defendant's mind and his capacity for forming the requisite intent.

In conclusion, the court's instruction concerning specific intent could not have reasonably misled the jury into believing that it did not need to find specific intent in order to convict the defendant. The instruction left the jury free to consider all of the evidence, and did not limit it from considering whether, given what it knew of the defendant's state of mind, he could have formed the specific intent to commit the crimes charged.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] The defendant's argument, as the trial court noted, appears more akin to an extreme emotional disturbance defense. Extreme emotional disturbance is an affirmative defense that does not negate intent—in order to even consider the defense, the jury must first conclude that the defendant had the requisite intent to commit the crime charged. See D. Borden & L.

Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (4th Ed. 2007) § 6-3, p. 503.