******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LAVINE, J., dissenting. Despite its thoughtful and well reasoned analysis, I disagree with the majority's conclusion that the respondent, the Commissioner of Correction, failed to prove that the absence of jury instructions in accordance with *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), was harmless error in the present case and, therefore, respectfully dissent.

My conclusion is informed by what I believe to be the steady transmogrification of the relatively narrow principles announced in *Salamon*, into something more expansive, as exemplified by the present case, *Banks* v. *Commissioner of Correction*, 184 Conn. App. 101,    A.3d    (2018), which this court also releases today, and others. Consequently, the seriousness of the conduct involving the normal incidents of what is typically thought of as kidnapping, and its devastating impact on victims, is being minimized because conduct that merely *facilitates* another crime—rather than that which is *necessary* to its completion—is being viewed as a continuation of the conduct associated with the other substantive offense. As will be discussed, I also believe that an analysis of the nonexhaustive six factors enunciated in *Salamon* supports affirmance of the habeas court's judgment.

*Salamon* provided a necessary corrective to the all too familiar scenario in which the state overcharged defendants by appending a kidnapping charge onto an assault, frequently a sexual assault. As the majority opinion in *Salamon* stated: "Unfortunately [the previous interpretation of the kidnapping law] has afforded prosecutors virtually unbridled discretion to charge the same conduct either as a kidnapping or as an unlawful restraint despite the significant differences in the penalties that attach to those offenses. Similarly, our prior construction of the kidnapping statutes has permitted prosecutors—indeed, it has encouraged them—to include a kidnapping charge in any case involving a sexual assault or robbery. In view of the trend favoring reform of the law of kidnapping that existed at the time that our statutes were enacted, and in light of the stated goal of the [Commission to Revise the Criminal Statutes] of creating a modern, informed and enlightened penal code, it is highly likely that our legislature intended to embrace . . . reform, thereby reducing the potential for unfairness that had been created under this state's prior kidnapping statutes." *State* v. *Salamon*, supra, 287 Conn. 543–44.

The change brought about by *Salamon* was necessary and appropriate. Permitting kidnapping to be charged in many of these cases ignored the real core of the criminal conduct involved—assaultive behavior—and gave prosecutors a cudgel with which to thrash defen-

dants, who were charged with two serious crimes, when only one had in essence been committed. This unreasonably lengthened a defendant's exposure and provided prosecutors with enormous leverage.

But like moss climbing up a tree, *Salamon*'s reach has crept steadily and now applies to situations beyond what I believe was originally contemplated by the case. A quick comparison of *Salamon* itself, and the instant case, puts my view into context.[1]

In *Salamon*, the defendant followed the victim up a flight of stairs. The victim fell and the defendant held her down by her hair. The defendant punched the victim in the mouth and attempted to thrust his fingers down her throat as she was screaming. The victim escaped and the defendant was arrested. Id., 515.

In its review of the law of kidnapping in Connecticut, the court noted that "[a]mong the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the isolation of a victim from the protections of society and the law and the special fear and danger inherent in such isolation." Id., 536. Severe sanctions for "relatively trivial types of restraint"; id., 538; were to be avoided, the court continued. The remedy proposed by the court in *Salamon* was as follows: "Our legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are *merely incidental* to and *necessary for* the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is *necessary* to commit the other crime." (Emphasis added.) Id., 542. It is noteworthy that the court used the word *necessary*, meaning required or essential; it did not refer to conduct which simply *facilitates* or *makes easier* the commission of the underlying crime.

Unfortunately, the cases are morphing from the easy task of concluding that holding down someone by their hair is incidental to the ongoing assault, to attempting to determine the defendant's often opaque and inchoate intent on the basis of his or her actions. Here, the conduct at issue involved petrifying innocent victims by pointing what appeared to be a gun at them, herding them into a refrigerator, telling them not to leave, closing them in—thereby isolating them from the outside world—and preventing them from communicating with someone to get help. All the while, and for every second, the victims were undoubtedly terrified and probably

afraid they were about to die. As the law in this area has developed, subsequent cases have minimized or overlooked the *merely incidental* to and *necessity* requirements of *Salamon* and have watered it down to apply to conduct that is not really *merely incidental* to or *necessary* to commit the underlying crime, but simply *facilitates* or makes completion of the underlying crime *easier* or *more convenient*. In other words, the *necessity* requirement is being eviscerated. This case provides a good illustration of this morphing.

It is true that judges and juries are often tasked with the difficult job of evaluating an actor's intent, but often, the intent involved is the intent to do a particular act. For example, a trier of fact may be asked to determine if someone intended to inflict "physical injury" or "serious physical injury" on another person. That, however, is far different than the amorphous task of determining how much time a defendant believes is *necessary* to commit a crime. Determining how much time is *necessary* to commit a crime—or what degree of force, coercion, or restraint is needed—in the eyes of an often violent criminal is an inherently impracticable, sometimes impossible, task. Suppose that the petitioner in this case, Leon Bell, believed, in good faith, that keeping someone locked up in a refrigerator *is necessary*, so he can escape to a hideout in northern California. Does this conduct meet the necessity test? Or to posit a closer case, suppose a defendant believes it *is necessary* to confine a victim until he reaches a nearby getaway car, but not until he gets on the highway 500 yards away? Can jurors really be expected to evaluate these sorts of matters in a meaningful, consistent, coherent way? Once the defendant has finished emptying a safe, or a victim's pockets, how can a jury be expected to determine what is in the defendant's mind in any rational, predictable manner as it relates to how much time is required to complete a crime or escape? The likely result of this trend is to permit gratuitous harm to be inflicted on victims of robberies, and encourage a mishmash of verdicts with no principled core.

In summary, I believe the necessary correction accomplished by *Salamon* is losing its moorings and is being extended too far. I believe the *necessity* requirement should be resuscitated and *Salamon*'s application should be restricted in some appropriate way only to cases in which the restraint is truly part and parcel of the underlying crime.

Even if my view is rejected, I would still affirm the judgment of the habeas court in the present case pursuant to the nonexhaustive six factors set out in *Salamon*. See, e.g., *White* v. *Commissioner of Correction*, 170 Conn. App. 415, 430–39, 154 A.3d 1054 (2017). I agree with both the majority's recitation of the facts for each robbery in the present case and its narration of the law governing the respondent's heavy burden in the context

of this collateral proceeding.[2] For the reasons that follow, however, I respectfully part ways with the majority regarding the assessment of the *Salamon* factors. I address each robbery in turn.

In the robbery of the Friendly's restaurant in Manchester, with regard to the first *Salamon* factor, it was uncontested at trial that the petitioner ordered an employee, Cheryl Royer, into the walk-in refrigerator after she opened the safe. It was also uncontested that he ordered her to remain there for an indeterminate period of time. Although the *duration* of Royer's confinement for, at most, a few minutes was relatively minor; see, e.g., *State* v. *Hampton*, 293 Conn. 435, 463–64, 988 A.2d 167 (2009) (victim driven around more than three hours prior to assault and attempted murder); *Eric M.* v. *Commissioner of Correction*, 153 Conn. App. 837, 846, 108 A.3d 1128 (2014) (victim restrained, gagged, and handcuffed for at least five hours), cert. denied, 315 Conn. 915, 106 A.3d 308 (2015); *State* v. *Nelson*, 118 Conn. App. 831, 861, 986 A.2d 311 (victim restrained for several hours and was driven to several locations after assault), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010); the *nature* of her confinement was qualitatively different when compared with other cases. The petitioner isolated Royer in an enclosed space that was shielded from public view, the location of which was entirely separate from the safe in the manager's office. In other words, the situs and isolating nature of Royer's confinement is a significant feature of the Manchester robbery.[3]

I acknowledge that, on the one hand, relatively short durations of restraint over limited distances can make it difficult to conclude, as a matter of law, that an alleged kidnapping was not incidental to another crime. See, e.g., *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 432–33. But on the other hand, a kidnapping conviction does not require any minimum or fixed period of confinement or degree of movement. See *State* v. *Salamon*, supra, 287 Conn. 546. Confinement for one minute can be as terrifying as confinement for hours, depending on the circumstances. The petitioner isolated Royer in a separate space within Friendly's that was secreted from public view and where she was certain not to be seen or found. He ordered her to remain there for either fifteen minutes or until he came back to get her. He also left her in the refrigerator after he fled the restaurant. In effect, Royer's isolation amounted to a "second level of restraint . . . ." *Nogueira* v. *Commissioner of Correction*, 168 Conn. App. 803, 842, 149 A.3d 983 (asportation of victim to window well, "essentially a deep hole," limited victim's escape routes), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); see also *State* v. *Salamon*, supra, 536 ("[a]mong the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the *isolation* of a victim from the protections of society and the

law and *the special fear and danger inherent in such isolation*" [emphasis added]). Such conduct is overwhelming evidence of the petitioner's intent to restrain Royer to a greater degree and for a longer period of time than was necessary to accomplish the robbery. See *State* v. *Winot*, 294 Conn. 753, 768, 988 A.2d 188 (2010) (intent may be inferred from circumstances and "[a]n accused's own words . . . constitute particularly compelling, direct evidence of his intent").

With regard to the second *Salamon* factor, the respondent argues that Royer's confinement helped to facilitate the petitioner's escape and that he already had completed the robbery before ordering Royer into the refrigerator. The petitioner argues that the confinement of Royer was part of the ongoing robbery and therefore was not a separate, distinct act.

When the circumstances could be viewed as being part of "a continuous, uninterrupted course of conduct"; *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 79, 136 A.3d 596 (2016); I recognize that this tends to weigh in favor of having a jury decide whether the accused possessed the requisite level of intent to be found guilty of a kidnapping under *Salamon*. See, e.g., id.; *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 433–35. Nevertheless, *Salamon* makes clear that "a defendant may be convicted of both kidnapping and another substantive crime if, *at any time prior to*, *during or after* the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, *the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime*." (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 547. "[T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . ." (Emphasis added; internal quotation marks omitted.) Id., 546.

Even if the jury, in accordance with *Salamon,* had been instructed to consider whether the confinement of Royer occurred during the commission of the robbery, the verdict would have been the same because such confinement had independent legal significance. See, e.g., 51 C.J.S. 319, Kidnapping § 26 (2010) ("in the case of robbery, where the confinement of a victim is greater than that which is inherently necessary to rob them, the confinement while part of the robbery is also a separate criminal transgression"). The petitioner could have taken the money from the safe after Royer opened it. Instead, he compelled her to enter the refrigerator, an entirely separate and enclosed space, after she opened the safe, and left her there when he fled. At most, her confinement made the robbery easier to commit. See, e.g., *State* v. *Ward*, 306 Conn. 718, 739–41, 51

A.3d 970 (2012) (suggesting that confinement or movement not merely incidental when it makes underlying crime easier to commit). And on appeal, both parties agree that the petitioner left Royer in the refrigerator to help him escape. See, e.g., *State* v. *Crenshaw*, 313 Conn. 69, 84–85 n.9, 95 A.3d 1113 (2014) (kidnapping continues until liberty restored). The state even argued this same theory to the jury.[4] Ordering Royer into the refrigerator and telling her to stay there, therefore, was neither incidental to nor necessary for the robbery.

Similarly, with regard to the third *Salamon* factor, the petitioner's restraint of Royer by isolating her in the refrigerator was not the type of restraint inherent in the nature of a robbery.[5] Some degree or type of restraint, though technically not an element of a robbery, is almost always necessary to rob someone. See General Statutes §§ 53a-91 (1) and 53a-133; see also *State* v. *Fields*, 302 Conn. 236, 247–48, 24 A.3d 1243 (2011). But I agree with the habeas court that the petitioner's confining of Royer in the refrigerator was not necessary to rob the Friendly's in Manchester. See, e.g., *State* v. *Jordan*, 129 Conn. App. 215, 223, 19 A.3d 241 (absence of *Salamon* instruction was harmless where defendant "controlled [the victims'] movement and prevented them from leaving" while he was not assaulting them and, therefore, actions were not merely incidental to assaults and sexual assault), cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011). Therefore, the specific restraint at issue here—confining Royer inside the refrigerator—is compelling evidence that the petitioner intended to restrain her for a period of time exceeding that which was necessary to commit the robbery.

Royer was also the only individual in the restaurant after closing at 1 a.m. Significantly, Royer's isolation in a separate and enclosed refrigerator prevented her from discerning what was happening, or summoning assistance, and reduced the petitioner's risk of detection. See *State* v. *Ward*, supra, 306 Conn. 736–38. And although the petitioner places great emphasis on the fact that Royer "[was] not locked in the [refrigerator] nor unable [to] seek help," this argument is unpersuasive with regard to the fourth and fifth *Salamon* factors. The petitioner explicitly stated to Royer that he had a gun and ordered her to remain inside the refrigerator. No reasonable juror, under those circumstances, could conclude that such restraint did not prevent Royer from summoning assistance or did not reduce the petitioner's risk of detection. Accordingly, the omitted element regarding the petitioner's intent to prevent Royer's liberation for a longer period of time or to a greater degree than was necessary to commit the Manchester robbery "was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 77–78.[6]

The facts and circumstances surrounding the Glastonbury robbery largely mirror those of the Manchester robbery, with one noteworthy difference. On April 14, 2001, the petitioner ordered Tricia Smith, the only Friendly's employee at the Glastonbury location at 6 a.m., to open the restaurant's safe and to then enter the walk-in refrigerator for an indefinite period of time. The undisputed evidence at trial further demonstrated that the petitioner took the money from the safe and left Smith inside the refrigerator when he fled. Both parties agree that this conduct facilitated his escape. Unlike the Manchester robbery, however, Smith testified that she heard the petitioner say something that she could not make out approximately two minutes after the petitioner ordered her to enter the refrigerator. The record does not provide any elucidation as to what the petitioner said, or if it was directed at Smith.

Notwithstanding this latter distinction, I believe that the record contains overwhelming and undisputed evidence that the petitioner intended to prevent Smith's liberation for a longer period of time or to a greater degree than was necessary to commit the Glastonbury robbery. I view this as a somewhat closer call than the Manchester robbery, but conclude nonetheless that the failure to provide an incidental restraint instruction in accordance with *Salamon* was harmless. See id.

Much like the Manchester robbery, the nature and situs of Smith's confinement is a key feature of the Glastonbury robbery when assessing the *Salamon* factors. With regard to the first and second *Salamon* factors, the petitioner's confinement of Smith essentially amounted to a "second level of restraint"; *Nogueira* v. *Commissioner of Correction*, supra, 168 Conn. App. 842; that restricted her movement to an extent exceeding that which was necessary to remove the money from the open safe. See *State* v. *Salamon*, supra, 287 Conn. 547. Although it was undisputed at trial that Smith's confinement was also for a relatively short period of time, it had independent legal significance. The petitioner left Smith inside the refrigerator after taking the money from the safe, and Smith did not exit the refrigerator until a few minutes after the petitioner left the restaurant. See, e.g., *State* v. *Crenshaw*, supra, 313 Conn. 84–85 n.9. Again, at most, confining Smith inside the refrigerator made the robbery easier to commit, but was by no means "necessary." See, e.g., *State* v. *Ward*, supra, 306 Conn. 739–41.

With regard to the third *Salamon* factor, Smith's confinement was not so much a part of the robbery that the offense could not have been completed without it. *State* v. *Salamon*, supra, 287 Conn. 546. The petitioner could have taken the money from the safe immediately after Smith opened it. Instead, he secreted Smith inside a refrigerator outside of public view and effectively controlled her movements for an indeterminate period

of time. See, e.g., *State* v. *Jordan*, supra, 129 Conn. App. 223. And with regard to the fourth and fifth *Salamon* factors, Smith's isolation prevented her from summoning assistance, reduced the petitioner's risk of detection, made it impossible for her to see or be seen by a third party, and undoubtedly was terrifying to her.[7] Regardless of what the petitioner might have said while Smith was inside the refrigerator, no reasonable juror could conclude that confining Smith inside the refrigerator was merely incidental to and necessary for the Glastonbury robbery. Simply put, the confinement of Smith in the refrigerator had independent criminal significance. See *Nogueira* v. *Commissioner of Correction*, supra, 168 Conn. App. 843.

Considering all the facts and circumstances, I conclude that no reasonable fact finder, even if properly instructed in accordance with *Salamon*, could find that the restraint of Royer and Smith was merely incidental to or a necessary part of either robbery. The uncontested and overwhelming evidence before the jury demonstrated that the petitioner intended to prevent the victims' liberation for a longer period of time or to a greater degree than was necessary to commit the robberies. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 77–78. Accordingly, the habeas court properly concluded that the absence of a *Salamon* instruction was harmless and, therefore, correctly denied the petitioner's second petition for a writ of habeas corpus. I therefore respectfully dissent.

[1] For a comprehensive review of post-*Salamon* cases, see *Nogueira* v. *Commissioner of Correction*, 168 Conn. App. 803, 149 A.3d 983, cert. denied, 323 Conn. 949, 169 A.3d 792 (2016).

[2] The respondent's burden of proving that the absence of *Salamon* instructions, beyond a reasonable doubt, did not contribute to the verdict obtained; see, e.g., *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 77–78, 136 A.3d 596 (2016) (absence of *Salamon* instruction is harmless error "[only] if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error" [internal quotation marks omitted]); is akin to the respondent demonstrating entitlement to a directed verdict on the same facts. See, e.g., *State* v. *Fields*, 302 Conn. 236, 253 n.17, 24 A.3d 1243 (2011) (properly instructed jury reasonably could conclude "that the defendant's restraint of [the victim] lasted for a period of time that was longer than necessary for the commission of the assault, [but] the state has failed to establish that the jury reasonably could *not* have reached a contrary conclusion" [emphasis in original]); *State* v. *Flores*, 301 Conn. 77, 87, 17 A.3d 1025 (2011) ("the test is whether there is a reasonable possibility that a properly instructed jury would reach a different result"); *Nogueira* v. *Commissioner of Correction*, 168 Conn. App. 803, 845, 149 A.3d 983 ("[u]nder the facts and circumstances of this case, we conclude that a reasonable fact finder, under the proper interpretation of our kidnapping law, *could not find* that the restraint of the victim was merely incidental to or an inherent part of the sexual assault crimes" [emphasis added]), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); see also *Bagley* v. *Adel Wiggins Group*, 327 Conn. 89, 102, 171 A.3d 432 (2017) ("[a] trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion" [internal quotation marks omitted]).

[3] The majority highlights the conflicting evidence between Royer's testimony and the petitioner's statement to police regarding how long the petitioner instructed Royer to remain inside the refrigerator. See footnote 9 of the majority opinion. I acknowledge this conflict and agree with the majority's reading of this court's decision in *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 104 A.3d 760 (2014), appeal dismissed, 327 Conn. 482, 175

A.3d 558 (2018) (certification improvidently granted).

Under the specific facts of both robberies in the present case, however, I disagree that any such conflict between the evidence introduced at trial, along with the limited distance of the movement of either Royer or Tricia Smith, an employee at the other Friendly's restaurant in Glastonbury that was robbed, is dispositive with respect to the respondent's burden. The very *nature* of the confinement—a key consideration under the first *Salamon* factor—suffered by both Royer and Smith at the petitioner's hands is qualitatively different than in any Connecticut case that I am aware of, besides the opinion which this court also releases today. See *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 101. How long the petitioner instructed Royer or Smith to remain inside the respective refrigerators arguably does bear on his intent to restrain them for a period of time exceeding that which was necessary to commit the respective robberies. Additionally, the time that either victim remained inside the refrigerators—i.e., the *duration* of their confinement—is also a relevant consideration. And so is the distance between the refrigerators and the safes. Nonetheless, I believe the very *nature* of the confinement in both robberies outweighs such considerations. In other words, the *nature* of the confinement is central to this court's analysis and is different from any Connecticut appellate case that I am aware of dealing with the issue presently before this court.

[4] During closing arguments before the jury, the prosecutor argued that the petitioner placed Royer in the refrigerator to facilitate his escape. The prosecutor stated in relevant part: "Cheryl Royer told you her intent was not to go back into that restaurant that night. It was certainly not to go into a walk-in freezer. . . . She was met by someone who threatened her, threatened her with the use of force, ordered her back inside, and then continued to restrain her by forcing her to go into the refrigerator. *And the intent in doing that, to me, clearly inferred this was to enable him to escape, to delay her, to keep her in the refrigerator until he could get away from the restaurant and be less likely to be caught*." (Emphasis added.)

[5] The majority concludes that the third *Salamon* factor supports the petitioner. See *Bell* v. *Commissioner of Correction*, 184 Conn. App. 150, 170, A.3d (2018). I respectfully disagree and believe the majority's assessment of this factor illustrates how *Salamon* is slowly breaking free of its moorings. *Salamon* instructs that "[t]he guiding principle is whether the [confinement or movement] was *so much the part of another substantive crime that the substantive crime could not have been committed without such acts* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 546. Simply put, the question is whether the confinement or movement was part and parcel of the other substantive offense. From this vantage point, I do not believe that a reasonable juror could conclude that the confinement in refrigerators of Royer and Tricia Smith, an employee at the other Friendly's restaurant in Glastonbury that was robbed, was part and parcel of either robbery, such that they *could not have been committed* without such confinement.

[6] Because the undisputed evidence at trial demonstrated that there was not a risk of the refrigerator door locking behind Royer, the habeas court concluded that placing Royer in the refrigerator did not create a significant danger or increase her risk of harm independent of that posed by the robbery. To the extent that this factor slightly weighs in favor of the petitioner, it is clearly outweighed by the remaining factors that demonstrate the petitioner's intent to prevent Royer's liberation for a longer period of time or to a greater degree than was necessary to commit the Manchester robbery. See, e.g., *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 438.

[7] Much like the evidence in the Manchester robbery, the evidence at trial did not demonstrate that Smith's confinement in the refrigerator created a significant danger or increased her risk of harm independent of that posed by the robbery. To the extent that the sixth *Salamon* factor weighs slightly in favor of the petitioner, it is clearly outweighed by the other *Salamon* factors.